No. 83,276

STATE OF KANSAS, *Appellee*, v. TODD MILLER DEAL, *Appellant*.

(23 P.3d 840)

Opinion filed June 1, 2001.

*Debra J. Wilson*, assistant appellant defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*David L. Miller*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Todd Miller Deal, from his conviction for premeditated first-degree murder. He was sentenced to life imprisonment, with no possibility of parole for 25 years.

Deal raises seven issues. The salient facts will be set forth under the individual issues.

The victim, Aubrey Phalp, was spending the night at her father's house. Her parents were divorced. Her father did not wake her in the morning, and when he attempted to wake her later in the day, he discovered the bedroom door was locked. Upon opening the door, he discovered Phalp was gone and that a bedroom window was open. A few days later, Phalp's body surfaced along the shore of Hillsdale Lake in Miami County, Kansas. Her body had a heavy

tow chain wrapped around her ankles. The chain belonged to Deal. Phalp had had problems with J.R. Waters, who had beaten her and held a knife to her throat. Apparently, there were some threats made that if she went to the police, harm would occur to her.

After Phalp's body was discovered, the police interviewed various people. Deal was interviewed on August 6, 1998, the day after the body was found. Deal denied having seen Phalp recently and denied any knowledge of her disappearance. A videotape of the interview was shown to the jury, and it was allowed to take the videotape and equipment to a jury room during deliberations. Deal told the police he had heard Phalp had run away from home. He stated that he had been in Independence, Missouri, with a friend, Shaun Garrett, visiting Jesse Cook and returned home on August 3, after Phalp had disappeared. He denied being at Hillsdale Lake in the prior 2 months and denied any knowledge of Phalp's death.

Jason Cook was interviewed and stated that Deal had come to visit him on August 5 (the day the body was discovered), and Deal told Cook that "he was around when someone got seriously hurt." He did not say he had killed anyone or that anyone had been killed. In an attempt to get Deal to make incriminating statements, Cook was equipped with a body pack transmitter and met with Deal. The conversation was monitored by police and was tape-recorded. The audio tape was played for the jury. During the conversation, Cook asked Deal, "So you and Shaun seriously did kill her?" Deal replied, "Seriously, I'm not gonna answer that." Later in the conversation, Cook said to Deal, "I didn't think you'd ever be able to do something like that." Deal responded, "It's pretty evident you thought wrong." Deal then talked about leaving town and saying goodbye to Cook's brother, Jesse. The following conversation then took place:

"[JASON COOK]: Why'd you pull fucked up shit man?

"[DEAL]: I can't tell you Jason.

"[JASON COOK]: Alright, but you do know you pulled some major fucked up shit.

"[DEAL]: Well, I had it planned so perfectly.

(cell phone ringing)

"[DEAL]: So perfectly.

"[DEAL]: I had it planned so perfectly, Jason. I shouldn't have put it on Jesse."

Deal was later interviewed and stated that he had lied about where he was on the night Phalp was killed. He then told the police he was in the park smoking marijuana. He allowed the police to search his truck where they found the chain hook that went with the chain wrapped around Phalp. Seventeen days later, Deal was arrested for Phalp's murder.

K.B.I. Agent George Johnston testified that he interviewed Deal on January 11, 1999. During the interview, Deal stated that on August 2, he and Garrett were at Garrett's house, and they decided to go to Hillsdale Lake to use Garrett's parents' boat. The two went in Garrett's car, got a chain, a 30-pack of beer, and left for the lake. Deal told Johnston that they left at 9 p.m. Deal and Garrett saw Phalp walking along 87th Street in Lenexa. She wanted to go with them; they agreed and headed for the lake. Because they had taken the wrong keys, however, they could not get the boat out of the storage garage. Deal, Garrett, and Phalp decided to go to the lake and smoke marijuana. Garrett told Deal that he wanted some private time with Phalp, so she and Garrett left.

Deal told Johnston that Garrett came back about 45 minutes later and said, "We got a problem, Aubrey's dead." Deal said that Phalp was sitting in the front passenger's seat slumped over. Deal picked up her arm with his foot, raised it up, and let if fall against the side of the car. Deal told Johnston that at the time he believed that Phalp was either dead or "extremely unconscious." Garrett told Deal to help him get rid of her and threatened to harm Deal and his family. Deal and Garrett drove the car up to the pier, wrapped the chain around Phalp's neck, and pulled her out of the car by the chain. Then they pulled her to the pier's walkway, picked her up, and carried her to the end of the pier. Garrett unwrapped the chain from her neck and tossed it to Deal, who then wrapped it around her legs. Garrett lifted Phalp up as Deal wrapped the chain around her ankles. Deal and Garrett then put her up on the cement railings of the pier and dropped her over the side into the water.

Deal also told Johnston that prior to Garrett and Phalp leaving together, he had given Phalp a karate kick to her stomach because

she had been harassing him. His kick caused her to double up and fall to the ground.

At trial, Cook testified that Deal told him that he had killed a girl by strangling her and had dumped her body in Hillsdale Lake. Deal also told Cook that he had wrapped chains around the victim's ankles to hold her down. Deal wanted Cook to be his alibi. Cook further stated that Deal told him that "they had killed Aubrey."

Jesse Cook also testified at trial that a few days after Phalp's body was found, Deal told him that he had strangled a girl and dumped her body in Hillsdale Lake. Deal later admitted to Agent Johnston that he had told Jesse that he had killed Phalp in the hopes that Jesse would be an alibi for Garrett and him.

Ron Hunke testified at trial that he worked with Garrett and that on Monday, August 3, 1998 (the day after the victim was killed), Garrett told Hunke, "We don't have to worry about that dumb bitch anymore."

## I. VIDEOTAPE INTERVIEW OF GARRETT

Deal argues that the trial court erred in refusing to admit Garrett's videotaped interview.

At trial, Deal's defense was that Garrett killed Phalp without his knowledge or assistance and then forced him to help dispose of her body. Johnston testified that he interviewed Deal on January 11, 1999. Johnston testified that Deal told him that he and Garrett were driving around on August 2 and saw Phalp on 87th Street in Lenexa. Phalp went to Hillsdale Lake with Deal and Garrett. The three of them smoked marijuana and drank beer. Deal told Johnston that Phalp and Garrett wanted to be alone and left together. After about 45 minutes, Garrett returned and told Deal that Phalp was dead and insisted that Deal help get rid of the body.

In addition to Johnston's testimony, Deal offered the videotaped statement, given by Garrett on August 6, 1998, to the K.B.I. The purpose of admitting the videotape, according to Deal, was to show the "state of mind and thought process" of Garrett. The State objected to the videotaped statement on the grounds that it constituted hearsay. The State further advised the court of its intention to prosecute Garrett. Garrett invoked his Fifth Amendment right

and was, therefore, not available for cross-examination. The trial court sustained the State's objection.

On appeal, Deal specifically argues that he hoped to show the jury that Garrett was lying about his whereabouts on the night of August 2.

The State argues that Deal failed to preserve this issue for appeal, as Deal failed to make a proffer of the videotaped testimony as required by K.S.A. 60-405. In attempting to admit the videotaped testimony, the following took place:

"[COUNSEL FOR DEAL]: It's my understanding that the State's objection to this videotape being played in its entirety is because—this is Defendant's Exhibit 2. It's the videotaped statement of Shaun Garrett. It's approximately the same length as Todd Deal's. We believe that it should be admissible to show his state of mind and his thought process. He's not available to testify in this matter. That's something we're aware of. We're trying to get his statement in through his videotape.

"THE COURT: I take it that this is a statement made by Garrett to the KBI?

"[COUNSEL FOR DEAL]: Yes, sir, on the same day that Todd Deal's statement was taken.

"[PROSECUTOR]: Your Honor, it's clear that this is hearsay. This is a statement of a party who is not present and will not be present or available to testify. There's no hearsay exception I can find or Mr. Moriarty has indicated that exists that would allow the playing of this videotape under these circumstances. The State objects to the playing of any portion of that videotape.

"THE COURT: Your reply, Counsel?

"[COUNSEL FOR DEAL]: I won't say anything additional.

"THE COURT: I'll sustain the objection. It will not be admitted. It will be made part of the record."

K.S.A. 60-405 sets forth the rules regarding the erroneous exclusion of evidence and states:

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers."

Failure to make a proffer of excluded evidence precludes appellate review. See *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 741, 822 P.2d 617 (1991) (argument that evidence was improperly

excluded will not be considered for the first time on appeal where no proffer was made pursuant to K.S.A. 60-405); *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, 623, 822 P.2d 591 (1991) (in order to preserve the issue for appeal, proffer must contain the substance of the excluded testimony); *Kearney v. Kansas Public Service Co.*, 233 Kan. 492, 499, 665 P.2d 757 (1983) (no reversible error where no proffer was made of excluded evidence pursuant to K.S.A. 60-405); *Querry v. Montgomery Ward & Co., Inc.*, 217 Kan. 104, 111-12, 535 P.2d 928 (1975) (consideration of excluded evidence is beyond review of the appellate court where no proffer is made to trial court); *State v. Nix*, 215 Kan. 880, 884, 529 P.2d 147 (1974) (refusing to consider whether there was error in excluding evidence where there was no proffer made); *Salem v. Salem*, 214 Kan. 828, 831-32, 522 P.2d 336 (1974) (argument that evidence was not considered by court could not be considered on appeal because a proper proffer was not made to trial court).

Deal made no proffer regarding the substance of the videotaped interview with Garrett. Deal did state the purpose of the proposed testimony but did not divulge the substance of the testimony as required by K.S.A. 60-405. On appeal, he argues that the testimony would have shown that Garrett lied about his whereabouts on the night Phalp died. This argument was not made before the trial court. The purpose of making a proffer to the trial court is to allow it to make an evidentiary decision based on the substance of the testimony. On appeal, we then have the opportunity, if it is argued by a party, to consider whether the trial court's decision was an abuse of discretion. Without a proffer, however, this court cannot consider whether evidence was improperly excluded because there is no basis to consider whether the trial court abused its discretion.

## II. VIDEOTAPED TESTIMONY SHOWING DEAL'S REFUSAL TO TAKE A LIE DETECTOR TEST

Deal argues that the trial court erred in refusing to grant a mistrial after the State introduced videotaped testimony showing Deal's refusal to take a lie detector test.

The trial court may declare a mistrial when prejudicial conduct makes it impossible to proceed with the trial without injustice to

the defendant. K.S.A. 22-3423(1)(c); see *State v. Rice*, 261 Kan. 567, 591, 932 P.2d 981 (1997). Declaration of a mistrial is a matter entrusted to the trial court's discretion, and the decision will not be set aside on appeal unless abuse of discretion is clearly shown. *State v. McClanahan*, 259 Kan. 86, 92, 910 P.2d 193 (1996); *State v. Bagby*, 231 Kan. 176, 179, 642 P.2d 993 (1982). If reasonable persons could differ regarding the propriety of the trial court's action, it cannot be said the trial court abused its discretion. *State v. Brown*, 249 Kan. 698, Syl. ¶ 10, 823 P.2d 190 (1991). The defendant has the burden of proving that he or she was substantially prejudiced. *State v. Massey*, 242 Kan. 252, 264, 747 P.2d 802 (1987).

Over objections, the trial court allowed the jury to view the August 6, 1998, videotaped interview of Deal by Agent Carmack and Detective Talcott. During the playing of the videotape interview the following took place:

"[AGENT CARMACK]: If, uh, down the road here you were asked to take a polygraph test . . . what are your feelings on that?
"[DEAL]: Polygraphs? You mean a lie detector test? I don't want to take a lie detector test."

During a break from the playing of the videotaped interview, the following took place between counsel and the court:

"[COUNSEL FOR DEAL]: In addition to those other comments about the polygraph, I couldn't tell if he said no or yes. There should be a cautionary instruction if not a mistrial on that part.
"[PROSECUTOR]: I don't know that the jury needs to be alerted to that again. It didn't have any detrimental effect and wasn't incriminating or exculpatory. There wouldn't be any further reference to that through any other witnesses nor will there be any witness who testifies about whether there was any followup on that issue. I couldn't hear what he said either. I think he said he would.
"THE COURT: I believe he said he would. That was just my hearing of it."

The entire court has carefully reviewed the videotape and unanimously agree that the tape clearly states: "I don't want to take a lie detector test." Admittedly, we were all alerted to what was coming, and we were listening carefully to see what was said. Obviously, defense counsel, the prosecutor, and the judge, who did not know what was coming, did not clearly hear what was said. There is no

evidence that any of the jurors heard the statement or, if so, what they understood it to mean.

In Kansas, absent stipulation by the parties, the results of a polygraph test are inadmissible in a criminal proceeding. *State v. Wise*, 237 Kan. 117, 124, 697 P.2d 1295 (1985); accord *State v. Lassley*, 218 Kan. 758, 760, 545 P.2d 383 (1976). Likewise, reference to a defendant's refusal to submit to a polygraph test is also inadmissible. See *State v. Webber*, 260 Kan. 263, 276, 918 P.2d 609 (1996) (refusal to submit to polygraph examination or the offer to do so is inadmissible); *State v. McCarty*, 224 Kan. 179, 182, 578 P.2d 274 (1978) (noting that it is the rule in Kansas that a refusal to take a polygraph test is not admissible into evidence); *State v. Roach*, 223 Kan. 732, 734, 576 P.2d 1082 (1978) (testimony that defendant refused a polygraph test is inadmissible); *State v. Emory*, 190 Kan. 406, 410, 375 P.2d 585 (1962) (it was reversible error for trial court to admit evidence that the defendant refused to take a lie detector test as the evidence prejudiced the substantial rights of the defendant).

Mere mention of the word "polygraph," however, is not grounds for mistrial. *State v. Green*, 245 Kan. 398, 406, 781 P.2d 678 (1989); *State v. Ulland*, 24 Kan. App. 2d 249, 259, 943 P.2d 947 (1997).

Deal objected to the reference of the mention of the polygraph examination in the videotaped testimony. The objection was not made immediately following the statement but was made during a break after the viewing of the videotape. A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. *State v. Sims*, 265 Kan. 166, 174, 960 P.2d 1271 (1998).

During the discussion of the objection, the parties were very careful not to elaborate on the "polygraph" issue. There was no other mention of polygraph throughout the remainder of the trial. Deal never requested a cautionary instruction prior to the case being submitted to the jury. Deal has failed to show substantial prejudice by the isolated reference to the polygraph examination.

The trial court did not abuse its discretion in denying the motion for a mistrial. The single mention of the polygraph test, although inappropriate, did not prejudice Deal or require a new trial.

### III. GRUESOME PHOTOGRAPH

Deal next argues that the trial court erred in admitting a gruesome photograph of Phalp taken after her death.

The admission of photographs of a decedent, including photographs taken during an autopsy, is not error when they are relevant to matters in issue, such as the cause and manner of death, and aid the understanding of a pathologist's testimony. The admission of such evidence is within the trial court's discretion. *State v. Childers*, 222 Kan. 32, 44-45, 563 P.2d 999 (1977). While the admission of gruesome photographs is rarely held to be an abuse of discretion, this court has done so in cases where the probative value was slight and the prejudicial effect great (other grounds for a mistrial were present). *State v. Harris*, 259 Kan. 689, 710, 915 P.2d 758 (1996). An abuse of discretion may be reached if the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice. *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990).

Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. *State v. Prouse*, 244 Kan. 292, 294-95, 767 P.2d 1308 (1989). Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. *State v. Carr*, 265 Kan. 608, 623, 963 P.2d 421 (1998); *State v. Harris*, 259 Kan. 689, 711, 915 P.2d 758 (1996); *Spears*, 246 Kan. at 286.

The photograph did assist Dr. Donald P. Pojman, a forensic pathologist, in explaining the attempt to determine the cause of death. Pojman performed the autopsy upon Phalp. Pojman did not observe any indication of acute trauma. There were color changes to the body due to decomposition and bloating. Pojman was shown State's Exhibit #9, the photograph of the head, neck, and chest area of Phalp and testified that the reason for the accelerated decomposing in the head and face was that there was congestion in the head and additional blood pooling inside the head as opposed to the rest of the body. One of the causes of the congestion would be strangulation, a closing off of the flow of blood from the head while the arteries allow blood to enter the head.

Pojman was unable to conclude that Phalp was strangled, partly because of the decomposition which can mask signs of strangulation. The cause of death was determined to be asphyxia, a general term for a lack of oxygen to the brain. This could occur from drowning, suffocation, smothering, or choking. Pojman could not determine whether Phalp was strangled, suffocated, or drowned. There were no signs of a struggle or defensive wounds.

The photograph, although graphic, was necessary in aiding the medical testimony by Pojman and assisted him in explaining the analysis of the cause of death. We find no abuse of discretion in the admission of the photograph.

## IV. AIDING A FELON

Deal argues that the trial court erred in refusing to instruct the jury on his theory of defense, which was aiding a felon. Deal contends that the failure to instruct on his theory of defense violated his due process rights under the constitution.

In making this argument, Deal does not claim that aiding a felon is a lesser included offense of premeditated first-degree murder but instead that aiding a felon is a defense to the crime charged. Deal's defense, however, is that he did not commit the crimes charged. If the jury believed that Deal did not commit the crime charged, it would have been required to acquit him. The jury, instead, convicted Deal of one of the crimes charged.

In *State v. Weigel*, 228 Kan. 194, 198, 612 P.2d 636 (1980), the appellant made the same argument. In determining that no such instruction was required, this court stated:

"Defendant's next point concerns his request that the court give an instruction on aiding a felon. Defendant had maintained throughout his trial that his actions, after he awoke from a drunken stupor and drove his companions away from the bank, were for the purpose of helping one of the female robbers get out of the state. He argues that this was his theory of defense and as such the court should have instructed thereon. We cannot agree. Aiding a felon is a separate criminal offense proscribed by K.S.A. 21-3812. It is not error to refuse an instruction thereon when the accused has not been charged with said crime and it is not a lesser included offense of the crimes of which he has been charged. Defendant was not charged with the crime of aiding a felon. The crime was not a lesser included offense of any of the crimes of which he was charged. See K.S.A. 21-3107. Therefore, the point is without merit."

Likewise, Deal's argument on this point is also without merit. The trial court did not err in refusing to give an instruction on aiding a felon when Deal was not charged with the crime. Deal's argument that his "defense" was that he committed another crime not charged is not a defense at all. His defense was that he did not commit the crime charged. The State chose not to charge Deal with aiding a felon. It would have been inappropriate for the trial court to instruct the jury on a crime which was not charged.

## V. AUGUST 6, 1998, VIDEOTAPE

Deal argues that the trial court erred in denying his motion to suppress his August 6, 1998, videotaped interview.

The prosecution has the burden of proving whether a confession or admission is admissible. K.S.A. 22-3215(4). On appeal, an appellate court will not reverse a determination that a confession or admission was freely, voluntarily, and intelligently given or that it was or was not "custodial" if there is substantial competent evidence to support the determination. See *State v. Jacques*, 270 Kan. 173, 183, 14 P.3d 409 (2000) (analyzing whether defendant was in "custody" under a substantial competent evidence standard); *State v. Clemons*, 251 Kan. 473, 480, 836 P.2d 1147 (1992) (using substantial competent evidence standard to decide whether defendant was in custody when he was interrogated); *State v. William*, 248 Kan. 389, 405-06, 807 P.2d 1292 (1991) (applying substantial competent evidence standard of review to determine whether defendant was in custody at the time he was questioned by police). The legal conclusion drawn from those facts is reviewed de novo. *State v. Dang*, 267 Kan. 198, 199, 978 P.2d 277 (1999).

On August 6, 1998, police located Deal, Hunke, and Garrett at Hunke's parents' house. Police had been looking for the three men in association with the investigation into Phalp's death. Deal, Hunke, and Garrett were asked to come to the Lenexa Police Department to speak with detectives about Phalp's disappearance. Garret and Hunke got into Deal's pickup truck, and Deal drove to the Lenexa Police Department while police followed.

Deal, Hunke, and Garrett did not object to going to the police station. The three were separated and interviewed in separate

rooms. The interviews were videotaped. *Miranda* rights were not read to Deal, Hunke, or Garrett. During Deal's interview, he denied any knowledge of the whereabouts of Phalp and claimed that he was with Jesse Cook on August 2, in Independence. Deal told police that he had heard that Phalp had run away from home and that he had not seen her since the "J.R. incident."

At trial, Deal properly objected to the introduction of the August 6, 1998, videotaped interview. Deal argued that the interrogation was a "custodial interrogation" and that because no *Miranda* rights were ever read, the videotape was inadmissible. The trial court overruled the objection and allowed the videotape to be played for the jury. In doing so, the trial court ruled that Deal was not in custody and that his statement was freely and voluntarily given. In responding to Deal's motion for a new trial, the trial court explained its previous ruling admitting the videotape evidence, stating:

"The defendant gave a statement to a K.B.I. agent and Miami County Sheriff's officer without first being warned of his rights pursuant to the *Miranda* decision. At the hearing held on the pretrial motion to suppress, the court found this to be a voluntary statement. The court sees no reason to modify that ruling at this time. The defendant was not in custody. He was not arrested. He was asked to come to the police station interview room. He did so voluntarily. The interview room was equipped with a videotaping device. The court will not reiterate all of its findings previously made, but emphasis should be made that the defendant was free to leave and did so at least twice during the videotaped interview. Furthermore, he received and made telephone calls on his cell phone during the course of the interview. The demeanor of the officers was kind, friendly, and was not coercive in any fashion. The defendant made this statement voluntarily, and it was admissible as evidence against him. Since he was not in custody at the time of the interview, it was not necessary that the officers advise him of his rights per the *Miranda* decision."

The Fifth Amendment to the United States Constitution states that "[n]o person shall be . . . compelled in any Criminal Case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." In *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court stated:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

In *State v. Benoit*, 21 Kan. App. 2d 184, 189, 898 P.2d 653 (1995), our court of appeals discussed the requirements of the *Miranda* and stated:

"*Miranda v. Arizona*, [citation omitted], prevents the prosecution from using statements, whether inculpatory or exculpatory, stemming from a custodial inter-rogation, unless the prosecution proves that procedural safeguards were used to secure the waiver of defendant's privilege against self-incrimination. These safe-guards include informing the person in custody, before interrogation, of his or her right to remain silent, right to speak with an attorney, and right to have an attorney present during questioning. If the person asks for an attorney, then all questioning must cease until the attorney is present. [Citations omitted.]

"The purpose of a *Miranda* warning is to protect a putative defendant against the compulsion to incriminate himself arising from an official custodial interro-gation. [Citation omitted.]"

This court recently discussed in detail the analysis required when considering whether interrogation evidence should have been excluded in *Jacques*, 270 Kan. at 185-86, where we stated:

"The first question in an analysis of the right to remain silent is whether the individual was subjected to a 'custodial interrogation' or whether it was merely an 'investigatory interrogation.' [Citations omitted.] '*Miranda* warnings are not re-quired for noncustodial questioning; they are required for custodial questioning.' [Citation omitted.] An objective standard is used to judge whether an interrogation is 'custodial.' The proper analysis is how a reasonable person in the suspect's position would have understood the situation. [Citation omitted.] A 'custodial interrogation' is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. [Citations omitted.] An 'investigatory interrogation,' on the other hand, is the questioning of a person by a law enforcement officer in a routine manner in an investigation that has not reached the accusatory stage and where such person is not in legal custody or deprived of his or her freedom in any significant way. [Citation omitted.]"

In order to determine if Deal was in "custody" at the time he was questioned and videotaped, several factors must be evaluated. These include: (1) when and where the interrogation occurred; (2)

how long it lasted; (3) how many police officers were present; (4) what the officers and the defendant said and did; (5) the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door; (6) whether the defendant is being questioned as a suspect or a witness; (7) how the defendant got to the place of questioning, that is, whether he came completely on his own in response to a police request or was escorted by police officers; and (8) what happened after the interrogation—whether the defendant left freely, was detained, or was arrested. The importance of each factor varies from case to case. *State v. Fritschen*, 247 Kan. 592, 603, 802 P.2d 558 (1990).

Deal argues that the *Fritschen* factors do not support the trial court's admission of the August 6 videotaped interview. In applying the *Fritschen* factors, Deal notes that (1) the interrogation took place in the early evening and that it took place at the Lenexa Police Department; (2) the interrogation lasted approximately 3 hours but that he was never told that he was free to leave when he asked when the questioning would be over; (3) there were two detectives present during most of the interview; (4) the detectives never told him that he was free to leave at any time even when he asked how much longer the interview would take; (5) the detectives told him that they were investigating Phalp as a missing person and did not reveal that they were investigating a homicide even though they had already found Phalp's body; (6) although he was never in handcuffs, he was placed in a locked room and could not leave without being "buzzed" out; (7) detectives continually asked him about his whereabouts the weekend of Phalp's death and asked him to take a lie detector test after finally admitting that they were investigating a homicide and not searching for a missing person; (8) he was escorted to the Lenexa Police Department although he chose to go there voluntarily; and (9) he was allowed to leave freely after the questioning was completed and was not further detained or arrested.

The State, on the other hand, contends that (1) Deal willingly followed the officers to the Lenexa Police Department; (2) Deal was free to leave at any time and although the detectives never

told him that he was free to leave, Deal never asked if he was free to leave; (3) Deal was never handcuffed or placed under arrest; (4) Deal never asked to make any phone calls or asked for anyone else to be present; and (5) Detective Carmack testified that if Deal had asked to leave, he would have allowed him to do so.

There is substantial competent evidence to support the trial court's ruling that Deal was not "in custody" at the time the videotaped interrogation took place on August 6, 1998. A reasonable person in Deal's position would have understood the situation to be a mere investigatory interrogation and not a custodial interrogation. *Miranda* warnings were not required. The trial court did not err in admitting Deal's videotaped interview.

## VI. PHALP'S STATEMENTS

Deal argues that the trial court erred when it allowed Phalp's father to testify regarding statements Phalp made to him shortly after the "J.R. incident."

The admission or exclusion of hearsay evidence is within the sound discretion of the trial court. *State v. Humphrey*, 267 Kan. 45, 55, 978 P.2d 264 (1999); *State v. Thomas*, 252 Kan. 564, 572, 847 P.2d 1219 (1993).

At trial, the State questioned Phalp's father about conversations he had with Phalp shortly after the "J.R. incident." Deal made timely objections on the basis that any testimony concerning statements Phalp had made to her father were inadmissible hearsay. The trial court overruled the objections and allowed Phalp's father to discuss the conversations he had with his daughter. The trial court admitted the evidence pursuant to K.S.A. 2000 Supp. 60-460(d)(2). K.S.A. 2000 Supp. 60-460(d) governs contemporaneous statements by an out-of-court declarant as a form of admissible hearsay if:

"the judge finds [the statement] was made (1) while the declarant was perceiving the event or condition which the statement narrates, describes or explains, (2) while the declarant was under the stress of nervous excitement caused by such perception or (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

Phalp's father testified that at about 12:30 p.m. on July 28 or July 29, 1998, Phalp spoke to him on the telephone. Phalp related to him that J.R. had just beaten her up, held a knife to her neck, and demanded money. Phalp told her father that Deal was there and stated, "Don't do that, that's too messy. Just snap her neck and toss her in the back of my truck. It's much cleaner that way." Phalp's father further testified that after he received the phone call he drove about 5 miles to Phalp. He testified that she had a laceration on her right shoulder, was bruised, and was having difficulty breathing. Phalp's father also testified that there was some damage to the drywall.

Deal contends that the admission of Phalp's out-of-court statements to her father violated his rights under the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.

Specifically, Deal argues that Phalp's father's testimony was inadmissible hearsay and that it bore no indicia of reliability. Furthermore, Deal argues that there was no showing or finding that Phalp had no incentive to falsify or distort the statements that she made to her father. This argument is without merit.

In *State v. Bratt*, 250 Kan. 264, Syl. ¶ 1, 824 P.2d 983 (1992), this court analyzed the admissibility of hearsay statements and the possible conflict with the Confrontation Clause. We stated:

"The Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. *Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception.* If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness." (Emphasis added.)

The excited utterance exception is a firmly rooted hearsay exception. See *Conner v. State*, 748 So.2d 950, 956 (Fla. 1999) (excited utterance is one of several firmly rooted hearsay exceptions); *State v. Castaneda*, 621 N.W.2d 435, 445 (Iowa 2001) (excited

utterance is firmly rooted hearsay exception); *State v. Gates*, 615 N.W.2d 331, 336-37 (Minn. 2000) (excited utterance is firmly rooted hearsay exception satisfying constitutional requirements); *State v. Salgado*, 126 N.M. 691, 696, 974 P.2d 661 (1999) (excited utterance is "uniformly considered" a firmly rooted hearsay exception and comports to Confrontation Clause requirements); *State v. Dennis*, 337 S.C. 275, 286-87, 523 S.E.2d 173 (S.C. 1999) (excited utterance exception has been used and approved of for over 200 years and is a firmly rooted hearsay exception). Firmly rooted hearsay exceptions are "so trustworthy that adversarial testing can be expected to add little to its reliability." *White v. Illinois*, 502 U.S. 346, 357, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992). Reliability is, therefore, inferred without any further showing. The trial court also found the victim was under stress when the statements were made.

The trial court did not abuse its discretion in admitting Phalp's father's testimony pursuant to K.S.A. 2000 Supp. 60-460(d)(2). As a firmly rooted hearsay exception, the statements were reliable, and the admission of such did not violate Deal's rights under the Sixth Amendment to the United States Constitution or the Kansas Constitution.

### VII. "OTHER CRIMES" EVIDENCE

Deal argues that the trial court erred when it admitted evidence of the "J.R. incident" and the "cemetery incident" because descriptions of each event constituted evidence of other crimes, inadmissible pursuant to K.S.A. 60-455.

The admission of evidence independent of K.S.A. 60-455 is entrusted to the sound discretion of the trial court and will not be overturned absent a clear showing of abuse of discretion. *State v. Carr*, 265 Kan. 608, 624, 963 P.2d 421 (1998).

K.S.A. 60-455 governs the admission of other crimes evidence and sets forth:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove

some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Deal argues that the State introduced evidence of other crimes, specifically the "J.R. incident" and the "cemetery incident," through the videotaped interview with Deal and through statements made by Phalp's father. Deal made proper objections to the introduction of such evidence at all pertinent times. The trial court overruled the objections and ruled that the evidence was admissible independent of K.S.A. 60-455 because it tended to establish a continuing course of conduct and established the relationship between the parties.

There is no "other crimes" evidence contained in Deal's videotaped interview. Indeed, throughout the interview, Deal denied having made threats against Phalp and denied having stated that they should snap her neck and throw her in the back of his truck. Deal also denied that they had ever taken Phalp to a cemetery and threatened her to recant her "J.R. incident" story. Deal claimed throughout that Phalp was the aggressor and that it was she who held a knife to Waters and not the other way around.

Phalp's father's testimony references several acts which may be considered wrongs committed by Deal and others against Phalp. Evidence of a discordant relationship is admissible in Kansas, even where the evidence concerns prior criminal or civil wrongs. Evidence of a discordant relationship is not limited to a marital context and has been allowed in several nonmarital situations. See *Carr*, 265 Kan. at 624 (allowing evidence of defendant's prior abusive treatment of her stepdaughter, prior to her death, to establish relationship of the parties); *State v. Young*, 253 Kan. 28, 37, 852 P.2d 510 (1993) (allowing witnesses to testify that the decedent had told them about the defendant's abusive behavior prior to her death); *State v. Mayberry*, 248 Kan. 369, 384-85, 807 P.2d 86 (1991) (several witnesses testified that decedent had been having problems with defendant prior to her death and that he had fought with and hit her); *State v. Fenton*, 228 Kan. 658, 667-68, 620 P.2d 813 (1980) (allowing sheriff's wife to testify that the deceased told her that the defendant had threatened her).

Phalp's father's statements were properly admitted to show Deal and Phalp's discordant relationship. The trial court did not abuse its discretion in allowing Phalp's father to testify concerning the "J.R. incident" or the "cemetery incident."

Affirmed.

ALLEGRUCCI, J., dissenting: I dissent as to the portion of the majority opinion relating to the granting of a mistrial for allowing evidence of defendant's refusal to take a lie detector test. I would grant the defendant a new trial.

This is not a case where "polygraph" or "lie detector" is simply mentioned. Here, the defendant was asked if he would take a polygraph test, and he responded he would not take a lie detector test. This is not a case where the defendant failed to object at trial.

In *State v. Emory*, 190 Kan. 406, 410, 375 P.2d 585 (1962), this court stated and held:

"In our present case the state contends defendant waived his objection to the testimony of Detectives Twichell and Overman for the reason he cross-examined Twichell, he did not object to Overman's testimony in chief, and he cross-examined Overman in regard to the lie detector test. We cannot agree with this contention because the trial court's admission of Twichell's testimony in the state's case in chief allowed the 'poison' to be brought in, so to speak, when it was, in fact, incompetent. Under our decision in the Lowry case, the only proper thing for the trial court to do was to sustain defendant's objection, to admonish the jury to disregard the testimony, as was done in the Smith case, and to see that no further reference was made to a lie detector test during the remainder of the trial.

"Our conclusion is that a new trial should be granted to this defendant because the trial court erred in the admission of evidence with reference to defendant's refusal to take a lie detector test and the erroneous admission of such incompetent evidence prejudiced the substantial rights of defendant whereby he was deprived of his only defense of alibi and was thereby denied a fair and impartial trial."

I cannot comprehend how the admission of evidence that the defendant refused to take a "lie detector" test would not prejudice his substantial right to a fair trial. The majority has chosen expediency over fairness. I would reverse the district court.

LOCKETT and SIX, J.J., join in the foregoing dissenting opinion.