No. 90,143

STATE OF KANSAS, *Appellee,* v. WENDELL E. PARKER, *Appellant.*

(89 P.3d 622)

Opin-
ion filed May 14, 2004.

*Nathan B. Webb*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Deborah L. Hughes*, assistant district attorney, argued the cause, and *Robert D. Hecht*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Wendell E. Parker was convicted by a jury of theft and first-degree premeditated murder. Before trial, Parker pled guilty to a misdemeanor charge of endangerment of a child. Parker appeals his jury convictions.

Destiny Hutcherson lived in a townhouse with her baby and her long-time friend, Dainna Counce. In May 2001, Destiny's boy-friend, the defendant Wendell Parker, also moved into the apartment. On Saturday, June 9, 2001, at approximately 10:15 p.m., Destiny and her 8-month-old son visited Destiny's mother, Eva Hutcherson. Destiny wanted Parker to move out. She told her mother that having him in her apartment was like having two kids, and she complained that he had taken her car a couple of times. Destiny left her mother's after 11 p.m. to return to her apartment.

Jaime Moten's townhouse was close to Destiny's and catty-cornered from it. Because Moten's apartment was hot on the night of June 9, Moten was sitting on her front porch. Dawn Dixon joined Moten at approximately 11 p.m., and they talked for up to an hour. Moten heard a loud banging noise and then saw the shadow of a person's torso and hands going up and down accompanied by pounding noises. Dixon recognized Parker by his out-of-shape Afro as the person making the shadow. Following the pounding noises, Moten heard a baby crying. The crying lasted for several minutes. After Moten had gone back into her townhouse, she looked out the window and saw Parker open the front door and look out of Destiny's apartment. Later he came out of the apartment 3 or 4 times, moved some bags around and put them in Destiny's car, removed something from her car, perhaps an infant car seat, and took it into the apartment. He said, "I will be back," and, "I love you, too, baby," before getting into the car and driving off. Moten heard no response to Parker's good-bye.

On Monday, June 11, Eva Hutcherson heard from her niece that Destiny had not been at work on Sunday or Monday. Eva went to

Destiny's apartment. Destiny's car was not there. Eva knocked, but got no answer. She looked in the mail slot and heard a little sound. She testified, "I heard a slight little sound. . . . Sounded almost like a cat meowing." Her daughter did not have a cat. Eva went to the apartment manager's office and called the police.

Officer Ludolph testified that he was dispatched to Destiny's townhouse on June 11 to meet Eva. After a maintenance man let them into the residence, Ludolph went upstairs and found a baby in a crib. He took the child outside to Eva. Destiny's body was found on the floor in another bedroom.

The apartment was in disarray. There was a telephone in a pan of water in the kitchen sink, piles of clothes and wastebasket contents on the floors, and furnishings strewn about.

Destiny's body was face-up on the floor clothed in pants and a bra with outer clothing around her ankles and pushed up to her neck and armpits. There was a writing tablet on her stomach, a bottle filled with blue liquid in her right hand, a bloody barbell on the floor to her left, a large knife on the floor above her head, and the handle of a large knife sticking out of her neck. Blood was pooled on the floor around her head and spattered on the floor and wall.

A note on the writing tablet said: "I told that Bitch about fucking with me you know what my is Diana C. I killed the bitch." A documents examiner identified Parker as the person who wrote the note that was found on Destiny's stomach. In a statement to police, Parker said that he wrote the note and put Dainna Counce's name on it.

Parker gave a statement to police. He said that he and Destiny were arguing and that he "snapped." He choked her, struck her with his fist, and hit her on the left side of her face with a barbell. Then he went downstairs, got two knives, and went back upstairs where he stabbed Destiny in the neck with one knife and in the stomach with the other. He took the knife out of her stomach and threw it on the floor near her, placed a St. Ides beer bottle filled with blue liquid in her hand, wrote the note, and put it on her stomach. He gave the baby a bottle and put him to bed. Looking for the keys to Destiny's car, Parker took her jeans off. He found

the keys downstairs in the cabinet under the kitchen sink. He tried to make a telephone call, but knocked the phone into the sink when he was unable to complete the call. Parker left town in Destiny's car.

External examination of the body at the autopsy showed that Destiny had crush and tear injuries related to impact on the left side of her face, a stab wound that went through her neck with the knife still in place, and a stab wound to the front of her abdomen. The cause of death was a combination of the stab wounds and blunt trauma from at least 3 blows to the head.

A blood pattern analyst with the KBI testified that the absence of blood stains on the bottle found in Destiny's hand even though there were stains behind it showed that the bottle was placed in her hand after the blood stains were deposited on the wall. The patterns of blood spatters were consistent with blows being delivered with the barbell, and the presence of several separate patterns of blood spatters on the wall indicated that there had been at least three blows. The placement of the blood spatters on the wall indicated that one blow was delivered when Destiny's head was up off the floor and another when her head was on the floor.

We first consider whether the district court abused its discretion in admitting evidence regarding the murder victim's child.

Parker complains of the admission of evidence that Destiny had a young child. The evidence he complains of is the crime-scene videotape and certain testimony of Eva Hutcherson, Officer Ludolph, Jaime Moten, and Dawn Dixon.

Parker filed a motion in limine in which he requested, among other things, exclusion of any evidence relating to Destiny's child, D.H. The district court granted the request in part "in that the State is not to present any evidence relative to the condition of the child." The district judge, however, declined to exclude "anticipated testimony that the child was heard crying and that's what alerted certain witnesses to the offense tak[ing] place at the deceased person's apartment or residence." The district judge treated Parker's motion as a continuing one and granted him a continuing objection to evidence relating to the child.

The crime scene videotape is a walk-through of Destiny's townhouse, which concludes with shots of her body on the floor of her bedroom. The videotape shows that the townhouse was in considerable disarray. Because it was a residence where an infant lived, there are a number of child-related items visible in the videotape. Among them are a playpen, a toy car, an infant car seat, stuffed animals, a crib, and photographs. Most are seen briefly and incidentally as the camera panned across a room, but the camera seemed to linger for a moment on a photograph of an adult and a baby.

Jaime Moten's townhouse was close to Destiny's and catty-cornered from it. While she was sitting on her front porch talking to Dawn Dixon the night of June 9, Moten heard a loud banging noise, saw a figure through the shade that was moving up and down with accompanying pounding noises, and then heard a baby cry. According to Moten, the baby cried for 2 or 3 minutes and then stopped. Dixon testified that she heard a baby crying "just a little bit."

Parker relies on *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998). He asserts that *Donesay* and the present case involve similar evidentiary issues. Comparison of the two cases, however, reveals little, if any, similarity.

In *Donesay*, "the only real question was whether the killing of Officer Easter was premeditated." 265 Kan. at 89. Over objection, his widow testified at length about Easter's personality, accomplishments, and their relationship, none of which had "any tendency in reason to prove any material fact." See K.S.A. 60-401(b).

She testified that Easter was very happy, full of life, would light up a room by walking into it, was always smiling, was well-liked and well-respected, was prom king, was named most inspirational player for the wrestling team. She also said that his mother called him "[h]er happy boy." 265 Kan. at 83. She testified that Easter had accepted a position with the Drug Enforcement Administration, she testified in detail as to her family and Christmas visits to her parents, and she described their last kiss. 265 Kan. at 84. The court concluded: "It is beyond clear that Mrs. Easter's testimony

was irrelevant, prejudicial, and inflammatory." 265 Kan. at 84. The court further stated:

"The purpose of the State's eliciting Mrs. Easter's testimony was not to identify the defendant as the killer, was not to show that he intended to kill Officer Easter, and was not to show premeditation. Her testimony was not intended to show the guilt of the defendant, and it did not. We can only conclude that it was intended to infuriate and inflame the jury against the defendant." 265 Kan. at 89.

As a result, the court concluded that the error could not be harmless: "The district attorney's insistence in presenting this testimony to the jury, and the trial court's allowing her to do it, affected the substantial rights of the defendant to a fair and impartial trial. Thus, we have no choice but to reverse the defendant's convictions." 265 Kan. at 89.

The evidence at issue in the present case is not comparable to the widow's testimony in *Donesay*. The evidence Parker complains of is related to Destiny's murder and its investigation. Eva Hutcherson and Officer Ludolph testified about finding Destiny's body, Moten and Dixon testified about what they saw and heard the night Destiny was killed. The videotape is of the crime scene. In contrast, the testimony of Mrs. Easter in *Donesay* was unrelated to the murder. Eva, Ludolph, Moten, and Dixon were called as witnesses because they had first-hand information about either the investigation or the murder. Their references to a baby were incidental to their accounts of the investigation or the crime. In contrast, Mrs. Easter had no first-hand information about the investigation or murder. She testified only about the deceased's personal life.

In *Donesay*, the court stated that the "admission of evidence in a murder trial regarding the victim's family, . . . which has been intentionally and not incidentally elicited by the prosecuting attorney during the trial, is patently improper and reversible error." 265 Kan. 60, Syl. ¶ 9. In this case, some evidence that Destiny had a baby was incidentally elicited by the prosecutor during the State's presentation of evidence of the murder and investigation, but the circumstances of the present case are not patently improper and reversible as they were in *Donesay*. In the circumstances of this case, we look to the regular standard of review for the admission of evidence.

Admission of evidence is entrusted to the sound discretion of the trial court. Discretion is abused only where no reasonable person would take the view adopted by the trial court. Absent a clear showing of abuse of discretion, evidentiary findings of the trial court will not be set aside on appeal. 265 Kan. at 82. It cannot be said of the evidence regarding Destiny's having a baby that no reasonable person would take the view of the trial court. Thus, there was no abuse of discretion.

Parker next contends that the State violated the pretrial ruling by presenting evidence of the child's condition.

He contends that the following exchange regarding Eva's going to Destiny's townhouse on June 11 is evidence of D.H.'s condition, which should have been excluded by the district court's ruling on the motion in limine:

"Q. Did you knock on her door?
"A. Yes, I did.
"Q. Did you receive any answer?
"A. No, I did not.
"Q. Does her door have any kind of a mail slot to it?
"A. Yes, it does.
"Q. Did you do anything with the mail slot?
"A. I looked in the mail slot. You can barely see in there. I looked in there and I listened after I knocked on the door. I heard a slight little sound.
"Q. I'm sorry?
"A. I heard a little sound.
"Q. You heard a little sound?
"A. Sounded almost like a cat meowing.
"Q. Did your daughter have a cat?
"A. No, she didn't."

Parker charges that the prosecutor's eliciting evidence of the baby's condition in violation of the motion in limine ruling demonstrates "ill will and was so gross and flagrant as to prejudice" Parker's right to a fair trial.

The State contends that defense counsel's continuing objection to the admission of evidence concerning the baby is insufficient to preserve a violation of the motion in limine ruling for appeal. The State cites *State v. Whitesell*, 270 Kan. 259, 283-84, 13 P.3d 887 (2000). In *Whitesell*, which does not involve a continuing objection,

the court stated that the defendant could not "raise an issue on appeal where no contemporaneous objection was made and where the trial court did not have the opportunity to rule." 270 Kan. at 283. The court has made clear that the rationale underlying the contemporaneous objection rule is to permit the trial court to avert error by precluding improper evidence. *State v. Gordon*, 219 Kan. 643, Syl. ¶ 9, 549 P.2d 886 (1976). Where the trial court has granted counsel's request for a continuing objection to evidence excluded by an order in limine, the trial court is in a position to avert error on account of the introduction of objectionable evidence. Thus, the rationale underlying the contemporaneous objection rule has been met, and the issue is preserved for appeal.

The threshold determination to be made with regard to the exchange Parker complains of is whether it in fact constitutes evidence of the baby's condition, which was prohibited by the motion in limine ruling. In other words, was there a violation of the order in limine? See *State v. Galloway*, 268 Kan. 682, 692-93, 1 P.3d 844 (2000). Parker argues that the evidence of a little sound, "almost like a cat meowing," showed that the child's condition was exhaustion coupled with dehydration. The appellant's position as stated in his brief is: "A juror could reasonably speculate that a child left alone in a crib for over two days [*sic*], without a diaper change, bottle, or food, would be so exhausted from crying, so dehydrated from lack of nourishment, that it couldn't even manage to cry—it could only 'meow.' " Parker's exaggeration of the length of time and his speculation seem to unnaturally inflate a minor bit of testimony far beyond reasonable inference. The jury heard that Eva had been told that Destiny did not report for work on Sunday or Monday, that Eva went to Destiny's townhouse and did not see Destiny's car in the parking lot, and that Eva heard a little sound through the mail slot in Destiny's door. It reasonably may be inferred that the little sound was an indication to Eva that, even though Destiny's car was not in the lot, someone was inside her townhouse. Eva then went to the manager's office and called the police. Neither the baby nor the baby's condition was mentioned, and reasonable inference does not extend to exhaustion and de-

hydration. There was no violation of the order in limine in the complained-of exchange.

Parker also contends that the trial court acted contrary to its own order in limine.

Parker argues that the trial court's ruling, due to a misapprehension of the elements of endangerment of a child, did not accomplish what the trial court intended. Parker requested that any evidence relating to Destiny's child be excluded. At the time Parker pled guilty to endangerment of a child, the judge ruled: "The Court is not going to allow any evidence that relates to the condition of the child. That is [underlying] facts to the conviction for child endangerment. The Court feels that that would inflame the jury against the defendant and unfairly prejudice the defendant." Before the State's opening statement at trial, the judge stated: "Again the caution to the State is because I did grant the motion in limine in part in that the State is not to present any evidence relative to the condition of the child. I am concerned about that inflaming the jury . . . ."

Parker seems to focus on the trial judge's parenthetical to evidence of the condition of the child—the facts underlying the conviction for child endangerment. Parker's point seems to be that the condition of the child is not an element of endangerment of a child. He does not direct the court's attention to any objection in the record to the order in limine *on this ground*. The scope of an order in limine is subject to the abuse of discretion standard. No abuse of discretion has been shown in the trial court's ruling.

Parker also contends that the district court abused its discretion in admitting gruesome photographs and video. He concedes that the set of photos are relevant.

Parker's appellate counsel complains that the jury was shown three different sets of gruesome photographs of the crime scene. In fact, the jury saw a videotape of Destiny's townhouse, where the crime occurred, and one set of photographs, which was used for several purposes. The photographic prints are also present in the record on a compact disc. The photographs on the compact disc were downloaded to the hard drive of a laptop computer used by

the State's witness, Michael VanStratton, to give a power point presentation on blood pattern analysis.

Parker contends that the trial court abused its discretion in admitting the videotape and the photographs in that they were unduly repetitious and cumulative. He further complains that the videotape "piggy-backed" into evidence irrelevant and prejudicial indications of the baby. Parker cites no cases in which the court found an abuse of discretion in the admission of cumulative photographic images.

In *State v. Green*, 274 Kan. 145, 147, 48 P.3d 1276 (2002) (quoting *State v. Bell*, 273 Kan. 49, 52-53, 41 P.3d 783 [2001]), the court quoted the following well-established rules relative to the admission of photographs in homicide cases:

" 'The admission of photographs in a homicide case is a matter within the trial court's discretion, and the trial court's ruling will not be disturbed on appeal absent the showing of an abuse of that discretion. *State v. Verge*, 272 Kan. 501, 515, 34 P.3d 449 (2001). An abuse of discretion has occurred when the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice. The admission of photographs in a murder case has rarely been held to be an abuse of discretion. *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001).

" 'Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case. *State v. Groschang*, 272 Kan. 652, 667, 36 P.3d 231 (2001). Photographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible. *Deal*, 271 Kan. at 493. Photographs used to prove the manner of death and the violent nature of the crime are relevant and admissible. *Groschang*, 272 Kan. at 667.' "

Although the court stated in *Deal* and repeated in *Green* that it would be an abuse of discretion to admit photographs that are unduly repetitious and cumulative or introduced solely for the purpose of prejudice, neither case involved those issues. In *State v. Deal*, 271 Kan. 483, 493, 23 P.3d 840 (2001), the court cited *State v. Spears*, 246 Kan. 283, 286, 788 P.2d 261 (1990), for the principle that admission of unduly repetitious and cumulative photographs may constitute an abuse of discretion. In *Spears*, the court found no abuse of discretion in the admission of photographs and a crime

scene videotape. The court stated: "An abuse of discretion may be reached if the admitted photographs were unduly repetitious and cumulative or their introduction was solely for the purpose of prejudice." 246 Kan. at 286. The *Spears* court cited *State v. Randol*, 212 Kan. 461, 467, 513 P.2d 248 (1973), for the unduly repetitious and cumulative photographs or prejudicial principle. 246 Kan. at 286.

Twenty-five photographs and the crime scene videotape were shown to the jury in this case. Although the number is high, most of the photographs were essential to VanStratton in explaining the blood patterns and linking them to the wounds on the victim's body and the instruments that caused the wounds. The videotape of the townhouse was useful, but certainly not essential, for acquainting the jurors with the scene of the crime. Our case law, however, requires only usefulness. We find no abuse of discretion in the trial court's admission of the photographs and videotape.

Parker's final contention is that he was denied a fair trial by cumulative errors. Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Humphery*, 267 Kan. 45, Syl. ¶ 10, 978 P.2d 264 (1999). However, here there are no errors to accumulate.

Affirmed.