NOT DESIGNATED FOR PUBLICATION

No. 114,588

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GLENN DEAN LIPPARD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed September 1, 2017.
Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Anna M. Jumpponen*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., MALONE, J., and HEBERT, S.J.

PER CURIAM: A jury convicted Glenn Lippard of multiple sex crimes committed against his daughter, including five counts of rape and several counts of aggravated indecent liberties with a child. The district court sentenced Lippard to nine consecutive hard-25 sentences, to be followed by an additional 118 months' imprisonment. Lippard appeals, arguing: (1) The district court erred in admitting jail calls between Lippard and his mother; (2) the district court erred in prohibiting Lippard from calling his expert witness; (3) the district court erred in admitting evidence that Lippard claims served no purpose other than to bolster the victim's credibility and appeal to the sympathy of the

1

jury; (4) the district court erroneously denied Lippard's motion for a bill of particulars; (5) cumulative error merits reversal of his convictions; and finally, (6) the district court abused its discretion in ordering Lippard's nine hard-25 sentences to run consecutively. After thoroughly reviewing the record on appeal, we reject each of Lippard's arguments and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On November 30, 2013, B.L. and K.L. were staying with their father, Lippard, at his house in Salina. K.L. had a seizure and was taken to the Salina Regional Health Center. Eventually, K.L was transferred to Children's Mercy Hospital in Kansas City and B.L. remained in Salina with Lippard. While K.L. was at Children's Mercy Hospital, she disclosed that Lippard had sexually abused her. On the day K.L. disclosed Lippard's abuse, B.L. was at the Wesley Medical Center (Wesley) in Wichita with Lippard visiting her grandmother, Gail Lippard, who had suffered a stroke. Police arrived at Wesley to arrest Lippard based on K.L.'s allegations and asked to speak with B.L. B.L. then told the police that Lippard also had sexually abused her. B.L. was unaware that K.L. also was being abused or that K.L. had disclosed the abuse.

Following Lippard's arrest, Salina Police Department detectives Amanda Londono and Sean Furbeck interviewed B.L. on December 15, 2013. At the interview, B.L. denied that Lippard had ever touched her inappropriately. On December 17, 2013, the State charged Lippard only for the crimes committed against K.L.

After returning home to Salina, B.L. told her mother, Noel, that she wanted to talk to Londono again to tell her that Lippard had raped her. Londono interviewed B.L. for a second time on December 18, 2013. On December 19, 2013, following the second interview with B.L., the State amended the complaint to add the crimes committed against B.L., totaling 62 counts.

2

The district court held a preliminary hearing beginning on February 13, 2014. B.L. testified at the hearing. She stated that Lippard would touch the inside and outside of her vagina when he came to her bedroom at night to tuck her in. She also testified that Lippard would make her cuddle with him in the recliner in the living room and he would touch her vagina on the inside of her clothing. She stated that this touching would occur at least one night of the weekend when she was visiting Lippard, but she did not know if it happened more than 10 times. She also stated that Lippard put his penis inside of her vagina when he came to tuck her in bed. B.L. testified that this occurred before her 14th birthday. Finally, B.L. explained that she did not tell the detectives what happened during her first interview because she was afraid of getting Lippard in trouble.

After the preliminary hearing, the State amended the complaint and eliminated some of the charges to reflect the testimony elicited at the preliminary hearing. Lippard asked the district court to dismiss the charges because there was insufficient evidence presented at the preliminary hearing to find probable cause; the district court disagreed and denied Lippard's motion. The district court then bound Lippard over for trial. After multiple continuances, Lippard's jury trial was scheduled to begin on February 2, 2015.

Prior to trial, Lippard filed several motions, including a motion to dismiss and a motion for a bill of particulars. The district court denied both motions. Lippard also filed a motion in limine, asking the district court to exclude several jail calls between himself and his mother, Gail, arguing that the phone calls were not relevant. The district court ruled that the phone calls were admissible as they showed Lippard's consciousness of guilt and were more probative than prejudicial.

On January 26, 2015, the State received Lippard's expert witness report that set out the anticipated testimony of Dr. Sam Barnett. According to the report, which is not included in the record on appeal, Barnett would testify about the interviewing technique used in K.L.'s and B.L.'s interviews. The State filed a motion to exclude Barnett's

testimony, arguing that the receipt of the expert witness report one week prior to trial was unreasonable and thus violated K.S.A. 22-3212. After hearing arguments of counsel, the district court agreed with the State and barred Barnett's testimony.

At Lippard's request, K.L. was evaluated for competency on February 2, 2015. After a hearing, the district court ultimately found K.L. competent to testify and participate in the trial. Nonetheless, on February 9, 2015, the State dismissed all charges related to K.L. and informed Lippard and the court that due to a medical condition, K.L. would no longer be participating in the trial. The State prepared a third amended information based only on the crimes against B.L., charging Lippard with five counts of rape under K.S.A. 2011 Supp. 21-5503 and four counts of aggravated indecent liberties with a child contrary to K.S.A. 2011 Supp. 21-5506(b)(3)(A). These counts were all nongrid offenses under Jessica's Law because they were allegedly committed when B.L. was under 14 years of age. The State also charged Lippard with five counts of aggravated indecent liberties with a child contrary to K.S.A. 2011 Supp. 21-5506(b)(1) and two counts of indecent liberties with a child based on crimes allegedly committed when B.L. was between 14 and 16 years of age. The State later filed a fourth amended information that dropped one of the counts of aggravated indecent liberties with a child contrary to K.S.A. 2011 Supp. 21-5506(b)(1), reducing the total counts to fifteen.

Lippard's jury trial began on February 10, 2015. B.L. testified on the first day. She stated that after her parents were divorced, B.L. would visit Lippard's house every other weekend and any time she felt like visiting. B.L. testified that she sometimes did not want to go to Lippard's house because he was sexually abusing her. She stated that the earliest incident occurred when she was in seventh grade. B.L. said that the sexual abuse started when Lippard would come to her room and tuck her in at night. She further stated that Lippard would lay down with her in the bed, rub her back, and touch her vagina with his finger, both inside and outside of her underwear.

4

B.L. stated that when Lippard would touch her, he would tell B.L. to "shut up and relax." He also told her not to tell anyone and alluded that he had his gun ready if she ever told anyone. B.L. stated that in addition to touching her in her bedroom, Lippard would make her sit with him in his recliner in the living room and would touch her vagina. B.L. also testified that Lippard put his penis inside her vagina. B.L. testified that Gail had walked in on Lippard while he was touching her vagina on one occasion, but Gail quickly shut the bedroom door. Finally, B.L. explained that she never disclosed the abuse because she did not want Lippard to get in trouble; he was her father and she loved him. She also explained that at her first interview with Furbeck and Londono, she denied Lippard's sexual abuse because there was a man in the room and she was uncomfortable and because she did not want to get her father in trouble.

Londono also testified. She stated that on December 15, 2013, she and Furbeck traveled to Kansas City to interview B.L. At this point, the State played a recording of B.L.'s first interview where she denied that Lippard had ever touched her inappropriately. Londono then recounted that on December 18, 2013, Noel contacted her and informed her that B.L. wanted to talk to Londono again. The State then played a recording of B.L.'s December 18th interview. After the interview, Londono explained that she set up a second SANE exam for B.L. because B.L. said she was experiencing soreness.

Noel next testified that she learned that Lippard had sexually abused B.L. on December 15, 2013. She explained that she arranged for the second interview after B.L. told her that she wanted to talk to Londono again. She also testified that B.L. had expressed to her that she wanted to lie and say she made up the abuse so that Lippard would not be in any more trouble. Noel explained that she contacted Londono again on December 23rd to let her know that B.L. was having these thoughts. Finally, Noel testified that since B.L. disclosed the abuse, she has experienced nightmares, panic attacks, and social anxiety.

Karen Groot, the nurse who performed B.L.'s SANE exam, also testified. She testified that she observed redness after examining B.L.'s genitals, but she did not see any vaginal injuries. She testified, however, that this was normal in patients who reported similar types of abuse as B.L. and that it was actually uncommon to find injuries.

The State played several phone calls between Lippard and Gail while Lippard was in jail awaiting trial. In the phone calls, which will be discussed in more detail later in this opinion, Lippard urges Gail to make sure that B.L. knows how bad the conditions are in jail and that if B.L. testifies and Lippard is convicted, B.L. will never see him again.

The State called B.L.'s therapist, Joni Alberts-Plumer, as its final witness. Alberts-Plumer testified about the concept of delayed disclosure wherein children who are sexually abused often do not disclose the abuse right away. She also testified about piecemeal disclosure. During the counseling sessions, Alberts-Plumer asked B.L. to make written notes about Lippard's abuse and the notes were admitted into evidence.

After the State rested, Lippard called Gail to testify in his case-in-chief. Gail testified that she frequently visited Lippard's residence. She also testified that B.L. never disclosed the sexual abuse to her, despite the two being close. Gail denied ever having walked in on Lippard sexually abusing B.L. Regarding the phone calls, Gail admitted that Lippard asked her to relay messages about how bad the conditions were in jail.

Lippard testified at trial. He stated that he and Gail painted "a dark picture" to B.L. of Lippard's life in jail because he wanted B.L. to know the truth. He also wanted B.L. to know that she did not have to testify. Lippard stated that he believed Noel was pressuring B.L. into "sticking to this story" because B.L. felt trapped. Lippard denied ever touching B.L. inappropriately.

After Lippard's case-in-chief, the State presented rebuttal evidence. Specifically, the State played five additional phone calls between Lippard and Gail. The State also recalled B.L. who asserted that Lippard was the only person who had ever sexually abused her. After deliberating, the jury found Lippard guilty of all counts.

After trial, Lippard moved for a judgment of acquittal, claiming the State presented insufficient evidence to find him guilty. The district court denied this motion. At sentencing, Lippard argued for a durational departure to a guideline sentence on the Jessica's Law convictions. The district court denied Lippard's motion for a departure and sentenced him to nine consecutive hard-25 sentences for each nongrid conviction. The district court also imposed the standard presumptive sentence for each on-grid conviction. All total, the district court sentenced Lippard to 225-years-to-life, plus 118 months' imprisonment. Lippard timely appealed the district court's judgment.

EVIDENCE OF JAIL CALLS

Lippard first argues that the district court erred in admitting several jail calls between himself and Gail. In the calls, Lippard urges Gail to make sure that B.L. knows how bad the conditions are in jail and that if B.L. testifies and Lippard is convicted, B.L. will never see him again. The State introduced some of the phone calls in its case-in-chief, and the State introduced additional phone calls as rebuttal evidence. The district court ruled that the phone calls were admissible as evidence of consciousness of guilt and were proper rebuttal evidence.

Lippard alleges that the phone calls were not relevant and, even if they were, they were more prejudicial than probative. He asserts that the phone calls were not relevant to his consciousness of guilt because at no time in the calls does he indicate that he was guilty or planning an escape, nor does he ask B.L. to lie. Lippard also argues that the phone calls were not proper rebuttal evidence because they did not contradict his

7

statement in his case-in-chief. Finally, Lippard argues that the jail calls were more prejudicial than probative because they indicated to the jury that he was incarcerated.

The State argues that the phone calls were relevant evidence of Lippard's consciousness of guilt and were more probative than prejudicial. Specifically, the State asserts that it introduced the phone calls as evidence of Lippard's guilt and his actions to influence B.L.'s testimony. The State points to the fact that in the calls Lippard urges Gail to contact B.L. and tell her about the poor conditions in jail to dissuade her from testifying. Similarly, the State argues that the phone calls were proper rebuttal evidence because they directly disputed testimony presented by the defense. Finally, the State argues that the jury would likely assume that Lippard was held in custody on such serious charges and would not be prejudiced by the fact that he was in jail.

*Were the jail calls relevant to the State's case-in-chief?*

Lippard first argues that the jail calls were not relevant to the State's case-in-chief. An appellate court's standard of review for a relevancy inquiry is well known:

> "The test for relevancy is whether the evidence has 'any tendency in reason to prove any material fact.' This definition requires the evidence to be material and probative. Evidence is material when the fact it supports is in dispute or in issue in the case. Review for materiality is de novo. Evidence is probative if it has any tendency to prove any material fact. Appellate courts review the district court's assessment of the evidence's probative value under an abuse of discretion standard. [Citations omitted.]" *State v. Dupree*, 304 Kan. 43, 63-64, 371 P.3d 862, *cert denied* 137 S. Ct. 310 (2016).

The district court ruled that Lippard's jail calls were relevant to show his consciousness of guilt. "Kansas and other state cases have held that evidence demonstrating a defendant's consciousness of guilt can be material to several issues in a criminal case including intent, identity, plan, or other matters." *State v. Huddleston*, 298

8

Kan. 941, 960, 318 P.3d 140 (2014). In *Huddleston*, the defendant was charged with first-degree murder stemming from the death of Todd Stover. Stover had promised Huddleston he could find her a job, but failed to do so. Huddleston felt that Stover was cheating her out of money and told her friend, Sharon Edwards, that she wanted to kill him. Edwards, a diabetic, suggested that Huddleston could kill Stover by injecting him with insulin. Huddleston, along with her sister, Rhonda Pischel, and Edwards picked up Stover and brought him to their house. Huddleston then injected Stover with approximately 100 units of insulin, resulting in his death. 298 Kan. at 942-44.

At trial, the district court admitted letters written by Huddleston to Rhonda while she was in jail awaiting trial. The first letter read:

> "'Rhonda Lou,
> "'Hey! What's up Rhonda you need to take your stuff to trial. Don't admit to dropping the body off. You can get a lot of time for that.
> "'I'm going to blame everything on Sharon E. [T]hat's who I think did it.
> "'You woke me up and we were scared that's why we did what we did.
> "'But Sharon Edwards gave the shot, and I took the blame. Please keep to that story.
> "'I love you
> destroy this letter.'" 298 Kan. at 958.

Huddleston's second letter was lengthy, and most of it addressed personal matters unrelated to the prosecution of Stover's murder. However, the letter included the following statement:  "'We need to make it look like Sharon E. gave the shot to him. What do you think[?] Don't you agree that that's what we need to do[?]'" 298 Kan. at 959.

The district court ruled the letters were admissible because they showed Huddleston's consciousness of guilt. The Kansas Supreme Court upheld the district court's ruling:  "[W]e agree with the district court's determination that the letters reveal

9

Huddleston acted in concert with her sister and indicate she was conscious of her guilt and the need to shift blame." 298 Kan. at 960.

As Lippard points out, *Huddleston* is distinguishable from the present case because Lippard's phone calls with Gail did not expressly indicate that he was guilty or planning an escape, nor did he ask B.L. to lie in the phone calls. Nevertheless, we agree with the district court that Lippard's jail calls were relevant to show his consciousness of guilt. Specifically, the phone calls showed that Lippard was trying to convince Gail to discourage B.L. from testifying. In a phone call on January 10, 2014, Lippard tells Gail:

> "We need to sit down and start trying to figure out too how to when we talk to [B.L.] how to drop it into her just in conversation, how to drop it in to her that she doesn't have to testify and also that you know, that if everything goes that the way that Noel's trying and the prosecutor's trying to push it, that I'm looking at going to prison for the rest of my life and she'll never see me. You need to be thinking about how to drop that in to her."

In a call from January 24, 2014, Gail tells Lippard that B.L. asked how he was doing in jail. Lippard tells Gail:  "You can paint it as bad as you can for her. She needs to know. She'll be the one that starts unravelling this whole thing." Lippard also instructs Gail to try to get B.L. to stay with her so Gail can "work on" B.L. On January 27, 2014, Lippard asks if Gail had spoken with B.L. and tells Gail that she has to stress the significance of his charges to B.L. After Gail tells Lippard that the investigator told her not to talk to B.L. about the case, Lippard responds:  "Well, but I'm telling you, you need to throw it in there."

In a call on January 29, 2014, Lippard again asks Gail if she had a chance to talk to B.L. and tells Gail that whenever she had the opportunity to remind B.L. about the significance of his charges and what "they [are] trying to do." In a call on February 3, 2014, Gail tells Lippard that B.L. wanted to know what he has for lunch. Lippard tells

10

Gail to tell B.L. he has "sorry food," just "slop." When Gail says that she wished she could do something for Lippard, he responds, "get [B.L.] on my side."

Lippard's argument that his phone calls were not relevant simply because he never expressly admitted his guilt misses the point. Here, Lippard was attempting to manipulate B.L. into not testifying; the phone calls were evidence of Lippard's consciousness of guilt because they showed that he was aware the only way to avoid conviction was to convince B.L. not to testify. Other courts have ruled that the State can introduce evidence of the defendant's attempt to dissuade a victim from testifying as it is admissible to show consciousness of guilt even when the defendant does not admit guilt in the statement. See *State v. Freeman*, 267 Neb. 737, 745-46, 677 N.W.2d 164 (2004) (defendant's attempted intimidation of a State's witness is evidence of the defendant's consciousness of guilt that a crime has been committed); *People v. Rosio*, 220 A.D.2d 851, 852, 632 N.Y.S.2d 255 (1995) (post-crime statements of a defendant intended to intimidate a victim are properly admitted as indicative of consciousness of guilt); *State v. Hicks*, 535 S.W.2d 308, 311-12 (Mo. App. 1976) (attempts to intimidate witnesses indicated consciousness of guilt).

Here, the content of Lippard's phone calls was relevant. Like in *Huddleston*, the phone calls showed Lippard's consciousness of guilt and his attempts to manipulate B.L. into not testifying. The calls were evidence that Lippard both directly encouraged B.L. not to testify by telling Gail to make sure that B.L. understood that she did not have to testify, as well as indirectly attempted to manipulate B.L. into not testifying by instructing Gail to tell B.L. about how bad the conditions were in jail. Lippard expressly colluded with Gail when they discussed that B.L. would be the "first to unravel" and that they needed to make sure B.L. knew Lippard would go to prison for the rest of his life. The calls were evidence of Lippard's consciousness of guilt as they clearly showed that he was aware that the only way to avoid conviction was to convince B.L. not to testify.

11

Finally, as the district court explained when it ruled the calls were admissible, the weight to be given to the evidence was for the jury to decide. The State was free to argue that the phone calls showed Lippard's consciousness of guilt. Likewise, Lippard was free to argue that the calls proved nothing and only showed the concerns of an innocent father who wanted to protect his daughter from the legal system. Although the jury was free to give the evidence whatever weight it deemed appropriate, the phone calls tended to prove a material fact and the district court did not err in finding the evidence was relevant.

*Were the jail calls proper rebuttal evidence?*

Lippard also argues that the district court erred by allowing the State to admit other jail calls between himself and Gail as rebuttal evidence. Lippard contends that the calls were not proper rebuttal evidence because they did not contradict the defense's evidence. The State argues that the additional calls were proper rebuttal evidence because they directly contested testimony in the defense's case-in-chief.

Lippard objected to the introduction of the five additional phone calls as improper rebuttal evidence at trial; accordingly, this issue is preserved for appellate review. An appellate court reviews the admission of rebuttal evidence for an abuse of discretion. *State v. Sitlington*, 291 Kan. 458, 464, 241 P.3d 1003 (2010).

> "'Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts witnesses on the opposing side, but also corroborates previous testimony.' [Citation omitted.]" 291 Kan. at 464.

12

The district court admitted one phone call to rebut Lippard's assertion that the previously admitted jail calls were being taken out of context. At trial, Lippard asserted that the State was taking his statements from his jail calls out of context by only playing short portions of the calls. Accordingly, the State played an entire recorded phone call to disprove that it was taking the phone calls out of context. The State chose the April 29, 2014, call because it was the only call that could be played in its entirety without needing redactions. This phone call was proper rebuttal evidence to contradict Lippard's statement that the State took his other jail calls out of context.

The remaining calls were offered to directly contradict testimony during Lippard's case-in-chief. The State introduced calls from May 20, 2014, and May 22, 2014; in the calls, Lippard keeps asking if Gail talked to B.L. for him. This contradicted Lippard's assertion that he wanted Gail to contact B.L. so that Gail could have visitation with B.L. It also rebutted Gail's testimony that Lippard did not tell her to keep a log of her calls to B.L. Finally, the calls rebutted Gail's testimony that Lippard never told her to contact B.L. from a different number. In the May 22, 2014, call, Lippard told Gail to call B.L. from Gail's work phone. The State also introduced a call from December 5, 2014, in response to Gail's testimony that she did not regularly drive around B.L.'s neighborhood. In the call, Gail admitted that she had been seen driving in the area. Thus, the calls were proper rebuttal evidence as they directly contradicted testimony presented by the defense. The district court did not abuse its discretion in admitting the calls as rebuttal evidence.

*Were the jail calls more prejudicial than probative?*

Lippard contends that even if the phone calls were relevant, the district court nonetheless abused its discretion in admitting the phone calls because they were more prejudicial than probative. Specifically, Lippard argues that the phone calls were prejudicial because they informed the jury he was incarcerated at trial. The State argues that Lippard did not raise this issue below so it is not properly preserved for appellate

review. Although Lippard did not specifically argue that the phone calls were prejudicial because they informed the jury he was incarcerated, he argued generally at trial that the phone calls should be excluded as evidence because they were more prejudicial than probative. We find that Lippard has properly preserved this issue for appeal.

K.S.A. 60-445 permits a district court to exclude otherwise relevant evidence if its probative value is substantially outweighed by its prejudicial effect. However, Kansas law favors the admission of otherwise relevant evidence and the exclusion of evidence under K.S.A. 60-445 is "'an extraordinary remedy to be used sparingly.' [Citations omitted.]" *State v. Miller*, 284 Kan. 682, 690-91, 163 P.3d 267 (2007). This determination is reviewed for an abuse of discretion. *Huddleston*, 298 Kan. at 961-62. Judicial discretion is abused if no reasonable person would take the view adopted by the district court or the district court's decision was based on an error of fact or law. *State v. Shank*, 304 Kan. 89, 92, 369 P.3d 322 (2016).

Lippard argues that the jail phone calls were more prejudicial than probative because they indicated to the jury that he was already incarcerated and, thus, must be guilty. However, our Supreme Court rejected this same argument in *Huddleston*:

> "Along lines similar to the trial judge's reasoning, this court has held that photographs depicting defendants in jail clothing were admissible, explaining that 'most jurors would hardly be shocked to learn that a murder suspect was taken into custody for some period of time, the only information communicated by jail clothing.' [Citations omitted.] . . .
> ". . . Assuming the jury even reached the conclusion [that defendant] was incarcerated, reasonable people could agree with the trial judge and conclude the probative value of the letters outweighed any minimal prejudicial effect generated by the inference of [defendant's] incarceration. The judge's decision to allow the State to introduce the jailhouse letters was not an abuse of discretion." 298 Kan. at 963-64.

14

The same reasoning applies here. First, the jurors in this case would hardly be shocked to learn that Lippard had spent some time in custody, considering the serious nature and number of his charges. Second, reasonable people could agree with the district court's determination that the probative value of these calls—namely, their tendency to show Lippard's attempts to dissuade B.L. from testifying—outweigh the minimally prejudicial effect of indicating that Lippard spent time in jail. The district court did not abuse its discretion by failing to exclude the evidence under K.S.A. 60-445.

EXCLUSION OF LIPPARD'S EXPERT WITNESS

Next, Lippard argues that the district court abused its discretion when it barred him from calling his expert witness because of his late disclosure of the expert witness report. Lippard's expert witness, Barnett, would have testified that the use of the "finding words" method of interviewing, which was used during B.L.'s interviews, is not a proper interviewing technique. Lippard acknowledges that he only provided notice that he intended to call Barnett one week prior to trial, but he argues that one week is a reasonable amount of time under K.S.A. 2016 Supp. 22-3212(c)(2), which governs disclosure of expert reports. Furthermore, Lippard argues that even if one week was not a reasonable amount of time, the district court erred in imposing the most severe sanction of barring Barnett's testimony because the State was already familiar with the content of Barnett's testimony and would not have been surprised.

The State points out that the district court was within its statutory authority to exclude Barnett's testimony because K.S.A. 2016 Supp. 22-3212 requires that an expert witness report be disclosed in a reasonable time prior to trial. The State asserts that one week before trial was not reasonable. Thus, the State argues that the district court did not abuse its discretion in excluding Barnett's testimony after finding that the expert witness report was not produced to the State within a reasonable amount of time prior to trial.

15

The admission of expert testimony lies within the sound discretion of the district court and its decision will not be overturned on appeal absent an abuse of discretion. *State v. Johnson*, 286 Kan. 824, 831, 190 P.3d 207 (2008). K.S.A. 2016 Supp. 22-3212(c)(2) requires the defense to provide the State with a summary or written report of what any expert witness intends to testify at "a reasonable time prior to trial." K.S.A. 2016 Supp. 22-3212(i) authorizes a broad range of sanctions for violations of discovery orders in criminal cases, including "prohibit[ing] the party from introducing into evidence the material not disclosed" or "enter[ing] such other order as [the court] deems just under the circumstances." See *Johnson*, 286 Kan. at 832.

On January 26, 2015, one week prior to the scheduled start of trial, Lippard provided the State with Barnett's report. After hearing arguments of counsel, the district court granted the State's motion to exclude the evidence, ruling:

> "[A]s a matter of fact and as a matter of law, providing an expert opinion to the extent as outlined by Dr. Barnett, relating to the interview protocol and all of his opinions contained therein, is not a reasonable disclosure prior—a week prior to trial.
>
> "... [W]e are a little more than a week away. And the Court fails to see how the State would be able to obtain the necessary review and rebuttal in that amount of time .... Simply not reasonable. That should have been turned over in October, November, December, and most of January to turn that over.
>
> "I think the Court cannot sanction that as a reasonable disclosure. And if this Court allowed that practice and put that burden upon the State, which is just, again, the Court doesn't see how they could overcome that burden and respond appropriately to that testimony. It would render that section of the discovery statute meaningless. "

The district court did not abuse its discretion when it refused to admit Barnett's testimony. First, it cannot be said that no reasonable person would agree with the district court's decision that one week prior to trial was not a reasonable amount of time to provide the expert witness report. Second, it was up to the district court to choose how to

16

sanction Lippard for his discovery violation. K.S.A. 2016 Supp. 22-3212(i) authorizes the district court to "prohibit the party from introducing into evidence the material not disclosed." We agree with the district court that Lippard's disclosure of the written report one week prior to trial was not a reasonable amount of time to allow the State to review the report and retain its own expert witness to rebut Barnett's opinions. Under these circumstances, excluding Barnett's testimony was an appropriate sanction to ensure that the parties remained on a level playing field at trial as to the evidence concerning B.L.'s interviews.

Finally, we note that Barnett's written report is not included in the record on appeal. The record is not clear as to what Barnett's proposed testimony would have been other than that the "finding words" interview technique used to interview B.L. is not a valid interview technique. K.S.A. 60-405 provides that a verdict shall not be set aside based on the erroneous exclusion of evidence unless the proponent of the evidence makes known the substance of the evidence in a form or method approved by the court. Moreover, the party asserting that the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016). Based upon the limited proffer of Barnett's testimony, we conclude that Lippard has failed to meet his burden of showing that the district court abused its discretion by excluding the evidence.

OTHER EVIDENTIARY ISSUES

Lippard next argues that the district court erred in admitting evidence that he claims served no purpose other than to bolster B.L.'s credibility and appeal to the sympathy of the jury. Specifically, Lippard claims the district court erred by admitting: (1) evidence of B.L.'s counseling notes; (2) the State's expert testimony about delayed disclosure and piecemeal disclosure; and (3) evidence about the impact of Lippard's abuse on B.L. We will examine each of these claims in turn.

17

*Evidence of B.L.'s counseling notes*

First, Lippard contests the district court's admission of notes written by B.L. during her counseling sessions about Lippard's abuse. He acknowledges that the notes were relevant but claims that they were cumulative to B.L.'s testimony. Lippard argues that the notes merely served to "prop up B.L.'s earlier testimony and give the appearance that there was considerable evidence behind the allegations of B.L." Finally, Lippard asserts that the notes improperly evoked sympathy from the jury.

Lippard first objects to the district court's admission of B.L.'s counseling notes because the evidence was cumulative to B.L.'s testimony. "Cumulative evidence is evidence of the same kind to the same point, and whether it is cumulative is to be determined from its kind and character, rather than its effect. [Citation omitted.] Cumulative evidence in itself is not objectionable." *State v. Hickles*, 261 Kan. 74, 88, 929 P.2d 141 (1996). Stated differently, although "'[t]here are instances when the trial court may in the exercise of its discretion refuse to admit testimony which is cumulative, cumulative evidence is not itself objectionable. [Citation omitted.]" *State v. Miller*, 284 Kan. 682, 699, 163 P.3d 267 (2007). Whether evidence is cumulative is reviewed for abuse of discretion. *State v. Rodriguez*, 295 Kan. 1146, 1158, 289 P.3d 85 (2012).

The State carries a heavy burden of proving the charges against Lippard beyond a reasonable doubt. Because a district court's decision to admit cumulative evidence is not on its own error, the district court here did not abuse its discretion in admitting B.L.'s notes even if they were cumulative of her trial testimony.

Lippard also argues that the cumulative effect of B.L.'s notes served to bolster her credibility and give the appearance that there was considerable evidence behind her allegations. However, in *State v. Reed*, 300 Kan. 494, 506, 332 P.3d 172 (2014), our Supreme Court held that the victims' handwritten notes that set out their version of the

abuse were relevant and did not serve to improperly bolster the witnesses' credibility. Specifically, the court explained that "prior statements by a witness are generally material and probative, i.e., relevant, because the consistency or lack thereof between the statement and the testimony either corroborates or undercuts the witness' credibility." 300 Kan. at 506. The same reasoning applies here. B.L.'s notes set out her recollection of Lippard's abuse and were relevant to either corroborate or undercut her trial testimony; the notes did not simply serve to improperly bolster her credibility.

Finally, Lippard's contention that the district court erred in admitting the notes because they improperly appealed to the jury's sympathy is unpersuasive. First, the notes were relevant as they detailed Lippard's abuse. Also, as discussed by our Supreme Court in *Reed*, the notes served as prior consistent statements of B.L.'s trial testimony. See 300 Kan. at 506. Finally, there was nothing in the notes that improperly appealed to the jury's sympathy. Instead, the notes simply recounted B.L.'s memories of the abuse inflicted by Lippard. For these reasons, the district court did not err in admitting B.L.'s notes.

*Expert testimony about delayed disclosure and piecemeal disclosure*

Next, Lippard argues that the district court erred by permitting Alberts-Plumer to testify about the concepts of delayed disclosure and piecemeal disclosure in sexual abuse victims. Lippard argues that this testimony was "simply a roundabout way" to vouch for B.L.'s credibility. Lippard does not, however, contest Alberts-Plumer's qualifications as an expert witness.

The State asserts that Alberts-Plumer properly testified about common characteristics of children who have been sexually abused. The State points out that Alberts-Plumer never offered an opinion on the credibility of B.L., nor did she opine whether B.L. was sexually abused. Finally, the State points out that the district court

19

provided a limiting instruction to the jury that nothing Alberts-Plumer said could be construed to mean that B.L. was a victim of sexual abuse.

Admission of expert testimony rests within the broad discretion of the district court. *State v. McIntosh*, 274 Kan. 939, 955, 58 P.3d 716 (2002). Whether the district court improperly allowed one witness to opine on the credibility of another witness, however, is a question of law subject to de novo review. *State v. Reed*, 40 Kan. App. 2d 269, 273, 191 P.3d 341 (2008). Though a witness may not express an opinion on the credibility of another witness, a qualified expert may testify about common patterns of behavior of sexually abused children. See *McIntosh*, 274 Kan. at 959-60.

Alberts-Plumer first testified about her extensive educational background in treating suspected victims of sexual abuse. She stated that she had worked at Three Rivers Family Therapy since 1996 treating child victims of sexual abuse. Alberts-Plumer then explained the concept of delayed disclosure wherein suspected child victims of sexual abuse do not disclose the abuse right away. She also explained the concept of piecemeal disclosure where a suspected victim does not tell everything at once.

The district court did not err in admitting Alberts-Plumer's testimony about delayed disclosure or piecemeal disclosure. Alberts-Plumer was a qualified expert witness; she had extensive education and experience in treating sexually abused children. As a qualified expert witness, Alberts-Plumer was permitted to testify about common patterns of behavior of sexually abused children. See *McIntosh*, 274 Kan. at 959-60. Also, Alberts-Plumer never offered an opinion on the credibility of B.L., nor did she opine whether B.L. was sexually abused. Finally, the district court provided a limiting instruction to the jury that Alberts-Plumer's reference to B.L. as a victim should not be construed "as a conclusion that B.L. has been sexually abused. It is for the jury to decide whether or not the State has met its burden of proof in this case." For these reasons, the district court did not err in admitting Albert-Plumer's expert testimony.

20

*Impact of Lippard's abuse on B.L.*

Finally, Lippard argues that the district court erred in admitting B.L.'s testimony about the impact of Lippard's abuse. Lippard argues that B.L.'s testimony about her problems in school, nightmares, and panic attacks was irrelevant to Lippard's guilt or innocence and instead served to "engender sympathy from the jury." The State first argues that Lippard failed to preserve this issue for appeal because he did not lodge a specific objection on these grounds at trial. Even if the issue is preserved, the State argues that the district court did not err in admitting B.L.'s testimony.

On direct examination, the State attempted to ask B.L. whether she had experienced problems at school due to Lippard's abuse; Lippard objected on relevancy grounds. The district court ruled that the impact of the abuse on B.L. was not relevant, but if Lippard was to challenge B.L.'s credibility, then the testimony was admissible as a prior consistent statement. After Lippard attacked B.L.'s credibility on cross-examination, the State again asked B.L. about the impact of Lippard's abuse on redirect. Specifically, the State asked B.L. if she was having trouble at school and Lippard objected on the ground that the question went beyond the scope of cross-examination; the district court overruled the objection. Next, the State asked B.L. if she had issues sleeping; Lippard objected that it was a leading question. Finally, the State asked B.L. about her panic attacks, and Lippard objected on the grounds of improper foundation.

The State argues that Lippard failed to preserve this issue for appellate review because he objected on different grounds at trial than he is asserting on appeal. Lippard objected to B.L.'s testimony at trial on multiple grounds, including relevancy, and he also argues on appeal that B.L.'s statements about the impact of the abuse were irrelevant. Thus, we conclude the issue is sufficiently preserved for appeal. See K.S.A. 60-404 (requiring a specific contemporaneous objection to the admission of evidence to preserve the issue for appeal).

21

Lippard contends that the district court erred in admitting B.L.'s statements because evidence about the impact of a crime is irrelevant. Lippard cites to *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998), to support his argument. In *Donesay*, the defendant was charged with killing a police officer. The State called the victim's widow to testify about her relationship with the victim, how they met, the victim's personality, the victim's plans for the future, as well as testimony about their last day together. 265 Kan. at 84. Our Supreme Court found that the widow's testimony was not relevant to any material fact of the crimes charged and concluded the testimony improperly influenced the jury and prejudiced the defendant's right to a fair trial. 265 Kan. at 85.

The State claims that Lippard's case is more similar to *State v. Parker*, 277 Kan. 838, 844, 89 P.3d 622 (2004). In *Parker*, the defendant was charged with first-degree murder after he killed his girlfriend. After killing the victim on a Friday, the defendant left the victim's child with a bottle; the victim's body and the child were not discovered until the following Monday. 277 Kan. at 839-40. At trial, the defendant objected to evidence about the discovery of the child at the crime scene. 277 Kan. at 842. The Kansas Supreme Court upheld the admission of the evidence and distinguished its holding in *Donesay*, explaining:

> "The evidence at issue in the present case is not comparable to the widow's testimony in *Donesay*. The evidence [the defendant] complains of is related to [the victim's] murder and its investigation. Eva Hutcherson and Officer Ludolph testified about finding [the victim's] body, Moten and Dixon testified about what they saw and heard the night [the victim] was killed. The videotape is of the crime scene. In contrast, the testimony of [the widow] in *Donesay* was unrelated to the murder. Eva, Ludolph, Moten, and Dixon were called as witnesses because they had first-hand information about either the investigation or the murder. Their references to a baby were incidental to their accounts of the investigation or the crime. In contrast, [the widow] had no first-hand information about the investigation or murder. She testified only about the deceased's personal life." 277 Kan. at 843.

22

We agree with the State that Lippard's case is more analogous to *Parker* than *Donesay*. Here, B.L.'s statements were relevant to the charged crimes and her statements about the impact of Lippard's abuse were incidental to her accounts of the crime. This case is not like *Donesay* where the victim's widow was merely testifying about the victim's personal life and describing events that had nothing to do with the crime for which the defendant was charged. B.L.'s statements were directly related to Lippard's crimes. Finally, B.L.'s statements about the impact of Lippard's abuse were relevant to her credibility as prior consistent statements. For these reasons, the district court did not abuse its discretion in admitting B.L.'s statements about the impact of Lippard's abuse.

## BILL OF PARTICULARS

Next, Lippard argues that the district court erred in denying his motion for a bill of particulars because the charges and supporting testimony at the preliminary hearing were too vague to permit Lippard to prepare an adequate defense. Lippard also argues that he was unable to contest B.L.'s credibility because "her testimony [was] so general and lacking in specifics." Lippard asks this court to reverse his convictions and remand for a new trial with orders that the State provide a bill of particulars.

The State argues that it tailored the charges against Lippard based on the testimony presented at the preliminary hearing. As a result, the State argues that Lippard was sufficiently apprised of the charges against him and could adequately prepare his defense. Thus, the State asserts, a bill of particulars was not warranted.

K.S.A. 22-3201(b) requires that a charging document contain "a plain and concise written statement of the essential facts constituting the crime charged." The precise timeframe of the commission of the offense does not have to be stated in the charging document, and it is sufficient if the time is shown to have been within the statute of limitations. K.S.A. 22-3201(b). If a charging document does not specify the particulars of

23

the crime charged adequately to permit the defendant to prepare a defense, on written motion of the defendant, the court can issue a bill of particulars. K.S.A. 22-3201(f).

"A bill of particulars has two functions: (1) to inform the defendant of the nature of the charges and the evidence to enable him to prepare a defense, and (2) to prevent further prosecution for the same offense." *State v. Myatt*, 237 Kan. 17, 29, 697 P.2d 836 (1985). A district court's decision to grant a bill of particulars is discretionary unless the charging document is so deficient that the defendant is not informed of the charges against him. *State v. Rojas-Marceleno*, 295 Kan. 525, 534, 285 P.3d 361 (2012). If the charges are clarified by testimony at the preliminary hearing, there is no need for a bill of particulars absent a showing of surprise or prejudice. *Myatt*, 237 Kan. at 29. Finally, the State is allowed to allege approximate timeframes in charges involving sex offenses against children. *Rojas-Marceleno*, 295 Kan. at 534.

An appellate court reviews a district court's order denying a motion for a bill of particulars for an abuse of discretion. *Rojas-Marceleno*, 295 Kan. at 533. Judicial discretion is abused if no reasonable person would have taken the view adopted by the district court or the district court's decision was based on an error of fact or law. *State v. Shank*, 304 Kan. 89, 92, 369 P.3d 322 (2016).

After the preliminary hearing, the State filed a second amended complaint that tailored the charges against Lippard based on the testimony presented at the hearing. The second amended complaint included the following timeframes: two counts of aggravated indecent liberties with a child and two counts of rape committed between August 1, 2011, and July 31, 2012; two counts of aggravated indecent liberties with a child and three counts of rape committed between August 1, 2012, and March 11, 2013; two counts of indecent liberties with a child and three counts of aggravated indecent liberties with a child committed between March 12, 2013, and November 26, 2013; and finally, two counts of aggravated indecent liberties with a child committed between the November 27,

24

2013, and December 1, 2013. Lippard subsequently filed a motion for a bill of particulars. The district court denied Lippard's motion, explaining in part:

> "And the Court would note that the evidence upon review by this Court presented at the preliminary hearing was sufficient for the bindover on the second amended Complaint, and that same hearing provided sufficient information that otherwise would have been provided in the Bill of Particulars. In other words, the second amended Complaint conforms in this Court's view to the evidence presented by the State at the preliminary hearing, and the record is clear that the defendant has not and will not be misled, prejudiced, or surprised based thereon. The charges in the second amended Complaint were sufficiently clarified by the evidence produced at the preliminary hearing. That motion for the Bill of Particulars is denied."

The district court did not abuse its discretion in denying Lippard's motion for a bill of particulars. First, the State did not have to provide precise timeframes because this was a prosecution for sex crimes committed against a child. See *Rojas-Marceleno*, 295 Kan. at 536-37. Second, the timeframes provided were sufficient to permit Lippard to prepare a defense. We note with significance that Lippard asserted a general denial of the charges against him. Lippard's defense did not turn upon the precise time that each crime allegedly was committed; instead, Lippard denied that he ever abused B.L. at any time.

Although B.L. was unable to provide specific dates, her testimony was sufficient to permit Lippard to prepare a defense. B.L. testified that the abuse started before she got in a car accident, which happened when she was in seventh grade. Noel also testified that the car accident occurred in December 2011. B.L. also stated that around the time the abuse started, she had started visiting Lippard every other weekend. She stated that Lippard would not molest her every day of the weekend but would touch her at least once. B.L. also testified that Lippard put his penis inside her vagina before she turned 14, which occurred in March of her eighth grade year. Finally, B.L. stated that the last time Lippard sexually abused her was over Thanksgiving break in November 2013.

25

The approximate timeframes set out in the second amended complaint were sufficient—when combined with the testimony at the preliminary hearing—to ensure Lippard was aware of the specifics of the charges against him and to allow him to adequately prepare a defense. B.L. provided specific details about the various instances of sexual abuse that sufficiently identified the offenses and linked evidence to specific counts. Lippard was neither prejudiced by the lack of precise dates nor was he surprised at trial. The district court did not err in denying Lippard's motion for a bill of particulars.

CUMULATIVE ERROR

Lippard argues that if none of alleged errors merit reversal on their own, the cumulative effect of those errors prejudiced Lippard and denied him a fair trial. Accordingly, Lippard urges this court to reverse his convictions based on the cumulative error doctrine. The State argues that because there were no trial errors here, the cumulative error doctrine does not apply.

Though any one single error may not warrant reversal of a conviction, those errors when considered collectively may be so serious as to merit reversal. *State v. Blanchette*, 35 Kan. App. 2d 686, 708, 134 P.3d 19, *rev. denied* 282 Kan. 792 (2006). "The reversibility test for cumulative error is '"whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under this cumulative effect rule, however, if the evidence is overwhelming against the defendant."'' [Citations omitted.]" *State v. Williams*, 299 Kan. 1039, 1050, 329 P.3d 420 (2014). The cumulative error doctrine does not apply if there is no error or only one error supporting reversal. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009). Here, we have found that there were no trial errors on the issues submitted by Lippard. Thus, Lippard is not entitled to any relief under the cumulative error doctrine.

26

SENTENCING ISSUE

Finally, Lippard contests the district court's sentence of nine consecutive hard-25 sentences to be followed by an additional 118 months' imprisonment, arguing that the sentence was overly harsh, vindictive, and an abuse of discretion. Lippard makes no constitutional argument that his sentence was cruel or unusual, and he acknowledges that life sentences are appropriate in Jessica's Law cases. However, Lippard contends that the imposition of nine consecutive hard-25 sentences is overly harsh because the practical result of this sentence is life without parole. Finally, Lippard asserts that his sentence was disproportional to the sentence he would have received for a homicide conviction.

The State argues that the district court's sentence was not an abuse of discretion because it cannot be said that no reasonable person would have imposed consecutive sentences. The State also points out that the Kansas Supreme Court has rejected the argument that sex crimes against children must be punished less severely than homicides.

The district court has discretion to order concurrent or consecutive sentences in nongrid cases. K.S.A. 2016 Supp. 21-6819(b). An appellate court reviews the district court's decision to order consecutive sentences for an abuse of discretion. *State v. Frecks*, 294 Kan. 738, 741, 280 P.3d 217 (2012). Judicial discretion is abused if no reasonable person would have taken the view adopted by the district court or the district court's decision was based on an error of fact or law. *Shank*, 304 Kan. at 92. The party asserting the district court abused its discretion bears the burden of showing such abuse. *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016).

This court has no jurisdiction to review the presumptive sentence of 118 months' imprisonment the district court imposed for Lippard's on-grid convictions. See K.S.A. 2016 Supp. 21-6820(c)(1). Lippard's argument on appeal boils down to a claim that the district court abused its discretion in imposing nine consecutive hard-25 sentences

27

because no reasonable person would have taken the court's view. When imposing consecutive sentences, the district court explained:

> "This Court is taking into consideration the age of the victim, the duration of the abuse from the age of 12 on, the relationship of the parties. It is—there is no other relationship quite like a father and his child as far as the trust that should exist between those two individuals. And the abuse of that trust and victimizing your own child is something for this Court to consider, as well as the duration of that victimization.
>
> "The seemingly callous approach that the defendant took to even allocution today in what the Court perceived as a shifting of the responsibility from whether it be himself or even this court proceeding to his own daughter, and the Court viewed that as a lack of understanding of the impact of these proceedings on a teenage child and requesting that she—well, this Court viewed that as manipulation of B.L. . . . . And the defendant took the opportunity today, instead of approaching the Court for most of the discussion, to turn his attention instead on a young teen-aged girl and manipulate that situation today. It was almost a revictimization of sorts for him to do that . . . .
>
> "Combined with the prolonged perpetration of sexual molestation on your own daughter this Court finds that consecutive sentences for all off-grid offenses are appropriate and hereby imposes consecutive for each what I count to be nine counts of off-grid 25-to-life sentences."

In imposing the consecutive sentences, the district court took into consideration the age of the victim, the nature of the relationship between the parties, and the fact that the sexual abuse began when B.L. was merely 12 years old. The district court told Lippard he abused the inherent trust in a father-child relationship by victimizing his own daughter, and he continued such abuse and victimization for an extended period of time. The district court noted that when Lippard addressed the court at sentencing, he failed to take responsibility for his crimes and instead attempted to shift blame to his daughter. The district court found that based on Lippard's actions in the courtroom, combined with the prolonged sexual molestation of his daughter and the impact of the crimes on a teenage child, consecutive sentences for the nongrid offenses was appropriate.

"It is the sentencing judge alone who determines the appropriate sentence to be imposed or other disposition of the case by exercising his or her best judgment, common sense, and judicial discretion after considering all of the reports, the defendant's background, the facts of the case, and the public safety. A sentence imposed within the statutory guidelines will not be disturbed on appeal if it is within the trial court's discretion and not a result of partiality, prejudice, oppression, or corrupt motive." *State v. Vanderveen*, 259 Kan. 836, 842-43, 915 P.2d 57 (1996).

Here, the district court's ruling was thorough and took into consideration the nature of the crimes, Lippard's efforts to intimidate and pressure his daughter during the pendency of the case, and his efforts to transfer responsibility to her at sentencing, all of which clearly evidenced the danger he poses. Lippard's request to receive concurrent hard-25 sentences would have been the equivalent of receiving a sentence for one Jessica's Law crime. But Lippard did not commit just one crime. He raped and sexually molested B.L. at least nine separate times when she was under 14 years of age, according to her testimony. The consecutive sentences imposed by the district court merely took into account the prolonged sexual abuse Lippard inflicted upon his daughter. Lippard has not shown that his sentence was a result of partiality, prejudice, oppression, or corrupt motive. Based on the record in its entirety, we are unable to say that no reasonable person would have agreed with the district court's decision to impose consecutive sentences.

Lippard also argues that the imposition of nine consecutive hard-25 sentences is overly harsh because the practical result of this sentence is "life without parole." While it is true that the practical result of Lippard's sentence is life without parole, this fact does not mean that the district court abused its discretion in imposing the sentence. The record reflects that Lippard was born on July 24, 1973, making him 41 years old at sentencing. For all practical purposes, Lippard would unlikely ever receive parole on nine *concurrent* hard-25 sentences, plus 118 months' imprisonment. At Lippard's age, he certainly would never receive parole even if the district court had ordered only two consecutive hard-25 sentences rather than nine. The fact that the Lippard's sentence is far greater than he will

29

ever be able to serve does not, in itself, make the sentence excessive. See *State v. Pham*, 281 Kan. 1227, 1265, 136 P.3d 919 (2006) (defendant's 16 consecutive sentences totaling life imprisonment followed by 1,306 months was not an abuse of discretion or excessive).

Finally, Lippard's argument that his sentence was disproportional to the sentence he would have received for a homicide conviction has been expressly rejected by our Supreme Court:

> "The fact that the penalty for certain categories of homicide may be less severe than the penalties for other, nonhomicide crimes does not automatically render the penalties for the nonhomicide crimes unconstitutional. There is no strict linear order of criminal activity that ranks all homicides as the most serious crimes and all nonhomicides as less serious, with the corresponding penalties necessarily ranking in diminishing durations of imprisonment.
> "Furthermore, as the State points out, Jessica's Law is not the only Kansas statute that provides for more severe penalties for nonhomicide crimes than for certain categories of homicide." *State v. Woodard*, 294 Kan. 717, 723, 280 P.3d 203 (2012).

In sum, reasonable persons may disagree on whether the district court's imposition of nine consecutive life sentences was excessive. But Kansas courts have consistently upheld consecutive life sentences and expressed a reluctance to overturn these sentences if reasonable persons might agree with the disposition. Here, the district court carefully explained its reasons for the consecutive sentences, and there is no evidence that the court acted vindictively. We are unable to say that no reasonable person would have taken the view adopted by the district court. Thus, we conclude the district court did not abuse its discretion by ordering Lippard to serve nine consecutive hard-25 sentences.

Affirmed.

30

BUSER, J., concurring in part and dissenting in part: I concur with my colleagues' rationale and decision affirming Lippard's convictions. I dissent from the majority's holding that the district court did not abuse its discretion by sentencing Lippard to serve nine consecutive hard-25 life sentences. I would vacate these sentences and remand for resentencing.

At the outset, I agree with the district judge and my colleagues that Lippard's reprehensible criminal conduct is deserving of punishment that will result in his spending the rest of his life in prison. The district judge's carefully detailed findings clearly support this result.

My quarrel with the imposition of nine consecutive hard-25 life sentences is that under no circumstances currently known to man is there any possibility that these sentences (totaling 225 years before parole eligibility) could ever be served. Indeed, as my colleagues acknowledge, "[f]or all practical purposes, Lippard would unlikely ever receive parole on nine *concurrent* hard-25 sentences, plus 118 months' imprisonment. At Lippard's age, he certainly would never receive parole even if the district court had ordered only two consecutive hard-25 sentences rather than nine." Slip op. at 29. That is my point.

I understand why the district judge believed it was appropriate to insure that Lippard would spend the rest of his life in prison. I do not understand why the district judge determined that Lippard should be sentenced to terms of imprisonment which are impossible to be served. What was the reason?

Child molestation cases by their very nature are notorious. They frequently incite public outrage and calls for extreme retribution to be exacted on the offender. Yet, for

exactly these reasons, a district judge should remain dispassionate and reasoned in exercising judicial discretion in sentencing offenders in these cases.

I can find no Kansas caselaw addressing whether sentences that can never be served are arbitrary. The majority mentions *State v. Pham*, 281 Kan. 1227, 1265, 136 P.3d 919 (2006), in support of the proposition that a sentence "far greater than [the defendant] will ever be able to serve does not, in itself, make the sentence excessive." Slip op. at 29-30. But my reading of *Pham* is that our Supreme Court did not reach the merits of whether Pham's lengthy sentences were improper because the Supreme Court did not have jurisdiction to consider the presumptive sentences imposed in that case.

"A trial judge's discretion in imposing a sentence is not boundless and is to be exercised with regard to what is right and equitable under the circumstances. *State v. Bailey*, 251 Kan. 527, Syl. ¶ 3, 834 P.2d 1353 (1992). I dissent because I believe that it is arbitrary for a district judge to impose nine consecutive hard-25 life sentences on a defendant when it is impossible for those sentences to be served in the defendant's lifetime.